### WHEELING.

## STATE OF WEST VIRGINIA *v.* DENT.

Submitted June 17, 1884.   Decided Nov. 1, 1884.

Sections 9 and 15 of chapter 93 of the Acts of 1882, passed March 15, 1882, entitled "An Act amending and re-enacting chapter 150 of the Code of West Virginia concerning the public health" is constitutional and valid.

GREEN, JUDGE, furnishes the following statement of the case :

At the November term, 1882, the grand jury of Preston county found an indictment in the circuit court of Preston against Frank M. Dent for practicing medicine in this State

*The other decisions announced at this term are published in Vol. 24.

without having complied with the provisions of section 9, of chapter 93 of the Acts of 1882, in violation of section 15 of said act. The defendant moved to quash this indictment. The motion, as is stated in the brief of the counsel for the plaintiff in error, was based solely on the ground that these sections 9 and 15 of chapter 93 of the Acts of 1882 were unconstitutional. The court decided that they were constitutional and overruled the motion; and the defendant then pleaded not guilty.

On the trial of the case it was proven that the defendant was engaged in the practice of medicine in the town of Newburg, Preston county, West Virginia at the time charged in the indictment, and had been so engaged since the year 1876 continuously to the present time, and had during all said time enjoyed a lucrative practice, publicly professing to be a physician, prescribing for the sick, and appending to his name the letters M. D.; that he was not then and there a physician and surgeon called from another State to treat a particular case, or to perform a particular surgical operation, nor was he then and there a commissioned officer of the United States army and navy and hospital service; that he has no certificate as required by section 9, chapter 93, Acts of the Legislature of West Virginia, passed March 15, 1882, but has a diploma from the "American Medical Eclectic College of Cincinnati, Ohio;" that he presented said diploma to the members of the board of health, who reside in this congressional district and asked for the certificate as required by law, but they, after retaining said diploma for some time, returned it to defendant with their refusal to grant him the certificate asked, because, as they claimed, said college did not come under the word reputable as defined by said board of health; that if the defendant had been or should be prevented from practicing medicine, it would be a great injury to him, as it would deprive him of his only means of supporting himself and family; that at the time of the passage of the Acts of 1882, he had not been practicing medicine ten years, but had only been practicing six as aforesaid, from the year 1876.

These being all the facts proven, the jury found the defendant guilty; and thereupon the defendant moved to ar-

rest the judgment, which motion the court overruled and
assessed the fine at $50.00 and rendered judgment on April
12th, 1882 in favor of the State against the defendant for
this fine and costs.   To the refusal of the court to arrest this
judgment upon the above facts, certified to be all the facts
proven, the defendant took a bill of exceptions, which on its
face states, that this motion was based on the ground that
"said act of the legislature passed March 15th 1882 styled
an act 'concerning public health,' was unconstitutional and
therefore void, so far as it interfered with the vested rights
of this defendant in relation to the practice of medicine."

To this judgment of the circuit court a writ of error was
allowed by a judge of this Court.

*M. H. Dent,* for plaintiff in error.

GREEN, JUDGE :

The only question involved in this case is :   Are sections 9
and 15 of chapter 93 of the Acts of 1882 constitutional?   I have
not examined critically the indictment to determine whether
in form or in substance it was fatally defective, because the
counsel for the plaintiff in error in his brief expressly
waives, as he states he did in the circuit court, all objections
to such defects in form or substance in the indictment, if any
such exist, and bases his claim to have the judgment of the
circuit court reviewed solely on the ground that the indict-
ment was based on an unconstitutional and void act of the
legislature and should for that reason have been quashed.
Sections 9 and 15 of chapter 93 of the Acts of 1882 claimed thus
to be unconstitutional are in these words:

"9.   The following persons and no others shall hereafter
be permitted to practice medicine in this State, viz :

"*First:* All persons who are graduates of a reputable
medical college in the schools of medicine to which the per-
son desiring to practice belongs.   Every such person shall,
if he has not already done so, and obtained the certificate
hereinafter mentioned, present his diploma to the State
board of health, or to the two members thereof in his con-
gressional district, and if the same is found to be genuine
and was issued by such medical college as is hereinafter

mentioned, and the person presenting the same be the graduate named therein the said board or said two members thereof (as the case may be) shall issue and deliver to him a certificate to that effect, and such diploma and certificate shall entitle the person named in such diploma to practice medicine in all its departments in this State.

"*Second:* All persons who have practiced medicine in this State continuously for the period of ten years prior to the eighth day of March, one thousand eight hundred and eighty-one. Every such person shall make and file with the two members of the State board of health in the congressional district in which he resides, or if he resides out of the State, in the district nearest his residence, an affidavit of the number of years he has continuously practiced in this State, and if the number of years therein stated be ten or more, the said board or said two members thereof, shall, unless they ascertain such affidavit to be false, give him a certificate to that fact, and authorizing him to practice medicine in all its departments in this State.

"*Third:* A person who is not such graduate and who has not so practiced in this State for a period of ten years, desiring to practice medicine in this State, shall, if he has not already done so, present himself for examination before the State board of health or before the said two members thereof in the congressional district in which he resides, or if he resides out of this State, to the said two members of the State board of health in the congressional district nearest his place of residence, who, together with a member of the local board of health who is a physician (if there is such member of the local board), of the county in which the examination is held, shall examine him as herein provided; and if, upon full examination, they find him qualified to practice medicine in all its departments, they, or a majority of them, shall grant him a certificate to that effect, and thereafter he shall have the right to practice medicine in this State to the same extent as if he had the diploma and certificate hereinbefore mentioned. The members of the State board of health in each congressional district shall, by publication in some newspaper printed in the county in which their meeting is to be held, or if no such paper is

printed therein, in some newspaper of general circulation in such district, give at least twenty-one days notice of the time and place at which they will meet for the examination of applicants for permission to practice medicine, which notice shall be published at least once in each week for three successive weeks before the day of such meeting. But this section shall not apply to a physician or surgeon who is called from another State to treat a particular case or to perform a particular surgical operation in this State, and who does not otherwise practice in this State.

"15. If any person shall practice, or attempt to practice, medicine, surgery, or obstetrics in this State, without having complied with the provisions of section 9 of this chapter, except as therein provided, he shall be guilty of a misdemeanor and fined for every such offense not less than fifty nor more than five hundred dollars, or imprisoned in the county jail not less than one month nor more than twelve months, or to be punished by both such fine and imprisonment, at the discretion of the court. And if any person shall file, or attempt to file, as his own, the diploma or certificate of another, or shall file, or attempt to file, a false or forged affidavit of his identity, or shall wilfully swear falsely to any question which may be propounded to him on his examination, as herein provided for, or to any affidavit herein required to be made or filed by him, he shall, upon conviction thereof, be confined in the penitentiary not less than one nor more than three years, or imprisoned in the county jail not less than six nor more than twelve months and fined not less than one hundred nor more than five hundred dollars, at the discretion of the court."

These sections, the counsel for the plaintiff in error insists, are unconstitutional, null and void. In an elaborate argument he claims, that they are inconsistent with Article X, and with section 1 of Article XIV of the Amendments to the constitution of the United States; and that they are also inconsistent with sections 1, 2, 4, 10 and 11 of our bill of rights, Article III of our constitution (Acts of 1872-3, p. 5). He claims, that the various provisions contained in the constitution of the United States and our constitution were intended to incorporate as fundamental principles in our gov-

ernment certain general views of the objects, ends and purpose of all governments laid down by certain text-writers, the correctness of which I do not question. I will here quote a number of these general views, selecting those upon which the counsel of the plaintiff must place his principal reliance:

"Every wanton and causeless restraint of the subject, whether practiced by a monarch, a nobility or a popular assembly is a degree of tyranny; nay even laws themselves whether made with or without our consent if they regulate and constrain our conduct in matters of mere indifference without a good end in view are regulations destructive of liberty."

"That constitution or form of government, that system of laws is alone calculated to maintain civil liberty, which leaves the subject entire master of his own conduct except on those points where the public good requires some direction or restraint."

"Wherever laws attempt to secure alike to every man, weak or strong, rich or poor, ignorant or instructed, the right, the moral power of seeking his own happiness in his own way, they invade natural liberty of which they ought to be the bulwork."

These and certain other general propositions laid down by certain text-writers are regarded by the counsel of the plaintiff in error as fundamental principles of our law and constitution and fairly deducible from the provisions of the constitution of the United States and of our bill of rights. And he mantains, that consistently with them no government can interfere with the right of a citizen to pursue his lawful trade, calling or profession, or by its legislature fix the qualifications necessary to be possessed by any person, before he may engage in any business, calling or profession, or confer on any board or other organized body the right to determine whether any person has the requisite qualifications, mental or moral, to engage in any business, calling or profession; and that if our legislature has done so, it has violated these fundamental principles of good government deducible from those provisions of our constitution; and that such laws of the legislature should be pronounced by the courts null and void. The counsel for the plaintiff in error in an elaborate argument has also attempted to show,

that sections 9 and 15 of chapter 93 of Acts of 1882, are most unjust and oppressive, and that they unnecessarily and injuriously interfere with the natural rights of every citizen to engage in the practice of medicine; that they thus interfere with the rights of the citizen by granting to a board the arbitrary right to pass upon his qualifications to practice medicine, and by providing that, unless his qualifications to practice medicine have been shown in the manner arbitrarily prescribed in section 9, if he should practice medicine, as he has a natural right to do, he should be liable to be punished as if he had committed a criminal offense.

Before considering these positions of counsel in any detail, it will be well to consider some general views, which have been taken by many courts and judges, bearing on the general subject. The conclusions reached by Judge Cooley after reviewing or referring to many authorities are as follows:

"The rule of law upon this subject appears to be, that, except where the constitution has imposed limits upon the legislative power, it must be considered as practically absolute, whether it operates according to natural justice or not in any particular case. The courts are not the guardians of the rights of the people of the State, except as those rights are governed by some constitutional provision, which comes within the judicial cognizance. The protection against unwise or oppressive legislation, within constitutional bounds, is by an appeal to the justice and patriotism of the representatives of the people. If this fail, the people in their sovereign capacity can correct the evil; but courts can not assume their rights. The judiciary can only arrest the execution of a statute, when it conflicts with the constitution. It can not run a race of opinions upon points of right, reason and expediency with the law-making power. Any legislative act, which does not encroach upon the powers apportioned to other departments of the government, being *prima facie* valid must be enforced, unless restrictions upon the legislative authority can be pointed out in the constitution and the case shown to come within them. If courts are not at liberty to declare statutes void because of their apparent injustice or impolicy, neither can they do so, because they appear to the minds of the judges to violate fundamental

principles of republican government, unless it shall be found that those principles are placed beyond legislative encroachment by the constitution. The principles of republican government are not a set of inflexible rules, vital and active in the constitution, though unexpressed, but they are subject to variation and modification from motives of policy and public necessity; and it is only in those particulars in which experience has demonstrated that any departure from the settled practice works injustice or confusion, that we shall discover an incorporation of them in the constitution in such a form as to make them definite rules of action under all circumstances."—Cooley on Con. Lim. 168.

These views of Judge Cooley are certainly entitled to the gravest consideration. He admits, however, on page 164 of the same work, that in certain extreme cases judges of great eminence have been understood to intimate, if not decide, doctrines different from those he asserts. While these views of Judge Cooley must be regarded as laying down correct principles, which should generally guide courts in deciding on the constitutionality of any statute, yet it may be that in certain extreme cases they ought to be departed from, but whether they are or are not of universal application I need not consider in this case, as it is no such extreme case; and the constitutionality of these sections 9 and 15 of chapter 93 of the Acts of 1882 is readily shown by the application to them of undisputed principles well settled by numerous decisions.

The several States of this Union possess a general police power, by which persons and property are subjected to all kinds of restraint and burdens in order to secure the general comfort, health and prosperity of the State; and the legislatures of the several states have the perfect right to pass laws to effect these objects and to adopt whatever necessary measures, they may deem proper to secure the comfort, health and prosperity of the State or of its citizens, by requiring every citizen to observe the maxim *sic utere tuo ut alienum non lædas.* These principles are laid down in the opinion of Justice Strong in *Railroad Company* v. *Husens,* 5 Otto 469; and they were cited and approved by this Court in *State of West Virginia* v. *Baltimore and Ohio Railroad Co.,* 24 W. Va. 783.

There can be no doubt that the legislature of this and and every other state should permit the utmost freedom of action by each citizen, that may consist with the public welfare; and it ought not by law to impose any restraint which the paramount claims of the community do not demand. But of course it does not follow, that the legislature can not legitimately restrain the action or conduct of any individual or citizen by a general law applicable alike to all, when such restraint is imposed for the purpose of promoting the comfort, health or prosperity of the community at large. Under these circumstances the legislature of any of the states has a perfect right under its general police power to pass laws placing individuals under restraint in the exercise of any business, calling or profession. This power has been constantly exercised by state legislatures; and the courts have, so far as I know, universally recognized such power and have held, that acts of the state legislature passed in the exercise of this power were constitutional and valid.

In a great variety of cases state legislatures have required licenses to be granted, before a citizen could engage in certain kinds of business or in certain professions, when from the character of the business or profession the public was liable to be imposed upon, unless the individual citizen was placed under this and other restraints imposed on all who engage in such business or profession. Thus laws have been passed to license bakers and to regulate both the weight and price of bread and to prohibit the baking of bread for sale by those not licensed. And such acts of the legislature have been held valid and constitutional. (*The Mayor and Aldermen of Mobile* v. *Quille*, 3 Ala. 137.) In no state in this Union, so far as I know, is a citizen permitted to engage in the business of selling intoxicating liquors without being placed under restraint by legislative acts. These restraints vary much in different states; and in very many of them the person desiring to engage in such business has first to obtain a license from a specified body or person, and before obtaining such license has to establish his fitness to engage in such business by proving his moral character. The general right of the legislature by statutes to regulate the sale of

intoxicating liquors and to place persons engaged in this business under whatever restraints the legislature deems necessary to protect the community from injury either to its morals or health is universally recognized by the courts and is so well understood, that no decisions need be referred to as recognizing the validity of this species of legislation. Other sorts of business have been put under restraint and regulation, the general rule being that the legislature may restrain any one in the exercise of his natural rights to engage in any business, whenever the promotion of the public safety, health or prosperity requires such a restraint.

The principle involved in this regulation by law of various sorts of business has been extended to various callings and professions. Thus, so far as I know, the practice of law is a profession, which the legislature of every state has deemed one which should be regulated by law, and those engaged in this profession are under restraint for the protection of the general public. The person proposing to practice law is everywhere required to obtain a license from some person or persons qualified to determine whether the applicant has the qualifications necessary to practice law. The constitutionality of such laws or even their propriety has never been questioned. The legislatures have, however, frequently gone further and imposed a tax on persons practicing law as lawyers; and although this right of the legislature to impose such a burden on members of this profession, while no such burden has been imposed on others, has been disputed, yet that right has generally been upheld by the courts. *State* v. *Gazley*, 5 Ohio 21; *Cousins* v. *The State*, 50 Ala. 113; *McCaskell* v. *The State*, 53 Ala. 510; *Simmons* v. *The State*, 12 Mo. 268; *Lanquille* v. *The State*, 4 Texas 312; *State* v. *Hayne*, 4 S. C. 403; *State of Louisiana* v. *Frank King*, 21 La. Ann. 201.

These cases as a matter of course recognize the authority of the legislature to require every one engaging in the practice of law to obtain a license. They may also be usefully consulted in determining what should be inserted in any indictment against any person for practicing a profession whether legal or medical without a compliance with the statute-law placing restraints on the practice of such profes-

sion and subjecting to indictment parties engaging in such professsion in violation of the statute.

The following additional cases may be referred to as showing not only that the right of the legislature is universally recognized to restrain persons in their business or profession, when the public security or prosperity would be promoted by such restraints, but also as showing what should be alleged in indictments for violations of statutes imposing such restraints: *Goldthwaite* v. *Montgomery*, 50 Ala. 486; *Cohen* v. *Wright*, 22 Col. 322; *Yale ex parte*, 24 Cal. 241; *Spencer ex parte*, 10 Nev. 323; *Porter & Co.* v. *State* 58 Ala. 66; *Antle* v. *State*, 6 Tex. App. 202; *State* v. *Goldman*, 44 Tex. 104; *Wheat* v. *State*, 6 Mo. 455; *Schmidt* v. *State*, 14 Mo. 137; *State* v. *Hale*, 15 Mo. 607; *State* v. *Richeson et. al*, 45 Mo. 575; *Ford* v. *Simmons*, 13 La. Am. 397; *Sheldon* v. *Clark*, 1 Johns 513; *Zimmerman* v. *Morrison*, 14 Johns. 369; *Thuson* v. *Johnson*, 9 Bosw. (N. Y.) 154; *Great Western R. R. Co.* v. *Bacon* 30 Ill. 347; *Gunnur & Son* v. *Sterling*, 93 Ill. 569.

These statutes requiring that every person, who undertakes to practice law must first be examined by judges competent to determine, whether he had the requisite qualifications, are based upon the well known fact, that none but those who have been specially educated with reference to practicing law can do so without great injury to the community, who must employ lawyers in their business, and who are nessessarily incompetent to a considerable extent to judge of the qualifications of a lawyer, and are thus subject to be imposed upon by pretenders ignorant of their profession.    To furnish the community some protection against such imposters the statute-law in perhaps every State in the Union prohibits any one from practicing law till he has first been examined by a competent judge or by a competent body of men, and a certificate of his qualifications and a permission to practice law has been obtained.

The same reasons would seem to require that no one should be allowed to practice medicine, who has not been first examined by some competent person or body of men as to his qualification to practice medecine and has not obtained permission to do so; for it is obvious, that the doctor equally with the lawyer requires a special education to qual-

ify him to practice his profession, and that the community is no more competent to judge of the qualifications of a doctor than of a lawyer and is liable to be imposed upon by imposters and quacks professing to practice medicine. Indeed the liability of the community to be imposed upon by quack doctors would, it seems to me, be even greater than their liability to be imposed upon by pretenders in the profession of the law. Yet the legislature of many States have singularly neglected to protect the community against imposition by quack doctors, and have left the community to only such protection against them, as was furnished by the common law; and even by it physicians undertaking to practice their profession were held responsible not only for due care and diligence but also for that degree of skill and capacity which ordinarily belongs to those who practice medicine. See *Seare* v. *Prentice*, 8 East 348. But many of our State legislatures have by statute-law afforded additional protection against the humbuggery of quack doctors. Thus at a very early day New York passed statute-laws intended to afford such protection.

The supreme court of New York as early as 1806 affirmed a judgment against a physician, inflicting a fine on him of $25 for practicing medicine contrary to the provisions of an act of the legislature. (*Sheldon* v. *Clark*, 1 Johns. 513). There was no question raised in this case as to the constitutional right of the legislature to pass such an act. By the terms of this act any person was forbidden to practice physic or surgery without a diploma; and if he did so, he could not collect his fees as a physician and was subject to be fined $25 for practicing without a license with certain provisions to be found in *Zimmerman* v. *Morrison*, 14 Johns. 369. The constitutionality of these and like laws have never been questioned in New York. See *Thompson* v. *Staats*, 15 Wend. 395.

In 1817 the legislature of Massachusetts passed an act, whereby it was provided, that no person shall recover his fees for medical services, who shall commence practice after July 15, 1818, without a degree or license. The validity of this and like acts of the legislature were never questioned in Massachusetts for many years. (*Spaulding* v. *The Inhabitants of Alford*, 1 Pick. 33). But an amend-

ment to this statute made in 1818, whereby it was provided, that no person practicing physic or surgery shall be entitled to the benefit of law for the recovery of any debt or fee for his professional services, unless he shall previously to rendering such services have been licensed by the Medical Society or been graduated a doctor in medicine at Harvard University. This amendment, it was claimed, was unconstitutional, not because it required a license of a physician before he could practice, but because in violation of their constitution it conferred particular privileges on the Medical Society and on Harvard University. But the court in *Hewitt* v. *Charir* (16 Pick. 356) decided that this act was constitutional. They say (page 356): "It seems to us, that the leading and sole purpose of this act was to guard the public against ignorance, negligence and carelessness in the members of one of the most useful professions," and this they treated as legitimate as a matter of course. See also *Wright* v. *Lanchton*, 19 Pick. 288.

In Maine the legislature has passed the following act: See R. S. 1871 ch. 13 § 3: "No person except a physician or surgeon, who commenced prior to Feb. 16, 1831, or has received a medical degree at a public institution in the United States, or a license from the Maine Medical Association shall recover any compensation for medical or surgical services, unless previous to such services he had obtained a certificate of good moral character from municipal officers of the town where he then resided." In *Bibber* v. *Simpson*, 59 Me. 181, it was decided that professional services of a medical clairvoyant were "medical services" within the meaning of this act and could not be recovered for if the clairvoyant had not complied with the act. There was no question or suggestion as to the constitutionality of this act.

The legislature of Texas on August 21, 1876 passed an act to regulate the practice of medicine, which provided among other things, that no one should practice medicine without having a certificate from some authorized board of medical advisers as provided by this act, and subjecting any one who did to be fined. In *Antle* v. *The State*, 6 Tex. 202, the court affirmed a judgment inflicting a fine of $50 on a doctor, who had violated this law. The principal question discussed was,

whether the information was properly drawn. The constitutionality of the act was not questioned. The provisions of this act may be found in *State* v. *Goldman*, 44 Tex. 104, where its constitutionality was again assumed to be indisputable.

On May 5, 1868 the legislature of Ohio passed "An act to protect the citizens of Ohio from empiricism and elevate the standing of the medical profession." It provided among other things, that it should be unlawful for any person, who had not attended two full courses of instruction and graduated at some school of medicine either of the United States or some foreign country, or who could not produce a certificate of qualification from some State or county medical society, and is not a person of good moral character, to practice medicine in any of its departments for compensation. This act was assumed as a matter of course to be valid in *Wert* v. *Clutter*, 37 Ohio 347.

There is a statute of the same general character in Missouri, the particular provisions of which I do not know. Under it a physician was convicted for practicing medicine. (*State* v. *Hale*, 15 Mo. 407). The court assumes that the statute is constitutional.

The legislature of Minnesota in 1883, (ch. 125 of Acts of 1883) passed an act, which among other things created a board of medical examiners and required all persons, except such as had been practicing medicine for five years within the State, as a condition of their right to practice, to obtain from this board after examination its certificate of their qualification, unless the person was a graduate of a school or medical college and had a diploma which had been presented to this board. This portion of this act was held to be clearly constitutional by the Supreme Court of Minnesota in the case of *Minnesota* v. *The State Medical Examining Board*, 32 Minn.

In the acts of Nevada (statute of 1875, 467) is "An act to prevent the practice of medicine by unqualified persons." In *Spiney ex parte*, 10 Nev. 328, it was claimed, that this statute was unconstitutional, because "it was a special law in a case where a general law was applicable, contrary to their constitution, and because it was in conflict with the

14th Amendment of the Constitution of the United States, which declares "that no State shall make or enforce any law which shall abridge the privileges or immunities of the citizens of the United States," and also with the second section of Article IV of the Constitution of the United States, which declares that "the citizens of each State shall be entitled to all the privileges and immunities of citizens in the several States." The act, to which these objections were urged, prohibited all persons from practicing medicine or surgery in the State, who had not received a medical education and a diploma from some regularly chartered medical school, and imposed a penalty of fine and imprisonment for every violation of these provisions. These provisions were held to be constitutional by the court; and in fact their constitutionality was not even disputed by counsel in argument. But there was a provision in this act that "no portion of this act should apply to those who have practiced medicine or surgery in the State for a period of ten years next preceding the passage of this act." This provision of the act, it was deemed by counsel, "was not founded upon any natural fair or reasonable distinction and makes the law special within the meaning of the prohibition of their constitution against special laws, where general laws can be made applicable, and made it a discriminating law within the prohibition of the Federal Constitution, which declares that no state shall deny to any person within its jurisdiction the equal protection of the laws." See Article 14 of Amendments of the Constitution, Section 10.

Three distinct grounds were taken by counsel to sustain their positions. 1: In admitting those who had practiced ten years and excluding those who had practiced nine years and eleven months. 2: In admitting those who had practiced the requisite period in the State and excluding those who had practiced during the same period in other States. 3: In making a distinction between those who have practiced in the State during ten years next preceding the passage of the act and those who had practiced just as long or longer in this State, but not continuously during the last ten years." These provisions it was insisted were arbitrary and unconstitutional. The first ground of objection was overruled by

the court, because according to the view of Judge Beatty "it was clearly within the province of the legislature to declare what is the *minimum* amount of experience that shall authorize a license to practice." The second ground was also overruled by the court, because according to the views of Judge Beatty the mere *practitioner* for ten years in Louisiana and Florida might acquire sufficient knowledge to practice in the diseases incident to the climate in these States and yet be unfit safely to practice in the diseases incident to the climate of Nevada. On the third ground there was some diversity of opinion. Only two judges sat in this case, Chief Justice Hawley and Beatty, judge. Judge Beatty was of the opinion that this third ground of objection did not render the law contrary to the provisions of the Nevada constitution forbidding special legislation, though the act was entirely without reason and arbitrary, so far as it required ten years practice in the State *preceding the passage of this act.* To his mind no reason could be assigned, why ten years practice in the State should not qualify one to practice medicine just as well when a portion of the ten years succeed the passage of the act, as when the whole ten years preceded the passage of the act. Nevertheless he could not hold, that the fact, that this provision of the law was thus arbitrary and unjust, rendered it contrary to the constitution of Nevada prohibiting special legislation. But he did regard this provision as contrary to the 14th Amendment of the Constitution of the United States, which forbids any State "to deny to any person within its jurisdiction the equal protection of the laws."

Upon this subject Judge Beatty says (page 334): "I entertain no doubt, that among the inherent privileges of the citizens of a free country is the right to pursue a lawful calling in a lawful manner, that is, subject to such restrictions, and none others, as may be deemed necessary for the public welfare. What restrictions are necessary in that view, it is the province of the legislature to decide, and its decision, no matter how ill-advised it may appear to be, is binding on the courts, whenever it appears to have been based upon motives of policy or general expediency. But when the law excludes a class of citizens from the pursuit of a useful, hon-

orable and profitable avocation, and there is no assignable motive of policy or expediency to justify the exclusion; or in other words when it is apparent, that the whole scope and object of the law is to make a forbidden discrimination without looking to the attainment of any public benefit, I think a court should not hesitate to say such a law is forbidden by the 14th Amendment of the Federal Constitution. I think there is no sort of reason for requiring the practice to have extended over the particular ten years *immediately preceding* the enactment of the law, and to this extent I am prepared to hold it unconstitutional."

Chief Justice Hawley on the contrary was of the opinion that the law was in all respects constitutional. He says, (page 355): "The right of the legislature to prescribe qualifications based upon professional skill or knowledge, so as to prevent unqualified persons from practicing any profession, has been time and again recognized in the various courts of the several states and in the Supreme Court of the United States. The recognition of this power necessarily implies, that the legislature is the sole judge of the qualifications, and that the establishment of any rule would to some extent be arbitrary and an imposition of some restraint upon its individual exercise." He declined to consider whether the law was in any respect unreasonable and unjust, and says on page 337: "In adopting the exception to the requirement that the person should have a diploma, that this should not be required of those who have practised medicine or surgery in the state for a period of ten years *next preceding* the passage of the act, the legislature did not infringe upon any provision of our State or Federal Constitution, and we are not therefore required to state what in our opinion may have been the motive for the enactment of this law. The reasons, which may have induced the legislature to insert the exception, may have been as varied as the different minds of its members. It is simply the question of power, which we are called upon to discuss and determine. Whether the power was reasonably or unreasonably exercised, whether it was wise or unwise expedient or inexpedient to enact the law, are questions left exclusively to other departments of our state government to decide; and their judgment must necessarily be decisive on these questions."

In the case of *Wert* v. *Clutter*, 37 Ohio St. 347, the question in controversy was, whether the Ohio statute by its exception in favor of persons, who had practiced medicine for ten years, was to be construed as meaning ten years prior to the passage of the act, or whether under the wording the statute only required ten years of continuous practice embracing the time since as well as before the passage of the act. This last construction was the one adopted by the majority of the court (three out of five judges), while two of the judges interpreted the act to mean, that the ten years of continuous practice must precede the passage of the act, in order to entitle one to practice medicine by virtue only of his being a practitioner. But none of the judges, who constituted the majority or minority of the court, intimated, that in their opinion the interpretation of the act, which would require the ten years continuous practice to precede the passage of the act, would make it unconstitutional or a violation of that portion of the 14th Amendment of the constitution of the United States, which forbids any state to deny to any person within its jurisdiction the equal protection of the laws. The notion, that it would do so, seems to have been a view peculiar to Judge Beatty of Nevada; and it seems to me that his reasoning is unsound, and if adopted by the courts, would lead to much mischief. The reasoning of Chief Justice Hawley in that case seems to me much more sound and was doubtless the ground on which all of the judges in *Wert* v. *Clutter*, 37 Ohio St. 347, acted, when they tacitly assume, that under any construction of the Ohio act it would not violate the constitution of the United States.

It seems therefore clear, that both on reason and authority we can not do otherwise than hold, that all the provisions in sections 9 and 15 of chapter 93 of the Acts of 1882 are constitutional and valid and should be approved by the courts. There is not a single provision in either of these sections of this chapter, that violates any provision of the constitution of the United States or of the constitution of this state. Acts very similar to the provisions contained in these sections have, as we have seen, been held to be valid by the courts in many of the States, and though their State constitutions have in them provisions entirely similar to most of the provis-

ions of our State constitution, which, it is insisted, are violated by these sections, yet in a great majority of the cases, which we have cited, their courts have assumed them to be valid and have not deemed it necessary to show that they were not inconsistent with any provisions of their State constitutions.    These decisions as a matter of course necessarily held, that laws of the character of those under consideration did not violate any provison of the constitution of the United States, which was in full force in all these States.

It would seem therefore useless to show how the provisions of sections 9 and 15 consist with all the provisions of the constitution of the United States.    It is only necessary to read the provisions in the constitution of the United States, which counsel claims conflict with these sections of our law, to see that in accordance with the well established modes of construing constitutional provisions as shown in the decisions referred to they can not be construed as in conflict with the sections of our law under consideration.

But as there are some provisions of the bill of rights, which are not found in the constitution of other States, I will refer to the one of those provisions of our constitution supposed to be in conflict with the provisions in these sections and show that there is no such conflict:

Article VI, section 1 of our constitution Acts of 1872-3, p. 11, provides: "The legislative power shall be vested in a Senate and House of Delegates." This obviously confers on them all legislative power except such as they are prohibited by the constitution in its other provisions from exercising. That sections 9 and 15 of chapter 93 of Acts of 1882 are legislative in their character is not only obvious on their face but is, if possible, still more clear from the fact that, as we have seen, many State legislatures have passed similar acts.    Are they in conflict with any portion of our constitution? They seem to me obviously not in conflict with the 39th section of article 6 of our constitution (p. 18-19 of Acts of 1872-3).    That article provides, that "in no case shall a special act be passed, where a general law would be proper and can be made applicable to the case." The act under consideration and sections 9 and 15 thereof seem to me so obviously not special acts,

that it surprised me to find, that such a law had ever been deemed to be a special act and in violation of this section; but it seems that claim has been made. In *Spinney ex parte*, 10 Nev. 326, such a law as this was decided not to be in conflict with a similar provision in the Nevada constitution.

Article III of our constitution, our bill of rights, section 1 (see Acts of 1872-3, p. 5), provides that "all men are by nature equally free and independent and have certain inherent rights, of which, when they enter into a state of society, they cannot by any compact deprive or divest their posterity, namely: The enjoyment of life and liberty with the means of acquiring and possessing property, and of possessing and obtaining happiness and safety." The law which we are considering is claimed to conflict with this provision of our bill of rights. Of course every man has the right to use the means of acquiring property; but the means which he uses must be lawful means. He can not acquire property by stealth or robbery. In so doing he would infringe on the rights of others, on their right (under this very provision of our bill of rights) to possess property. So he can not have a right to acquire property by the practice of medicine, if he has no qualifications to practice medicine, and if in his attempt to do so he destroys the health of others in violation of the law of the land. Therefore the legislature has a right by law to declare, that he shall not acquire property by the practice of medicine, unless he possesses the requisite qualifications, and there can be given to the community some assurance that he will not destroy the health of others. For how can others enjoy their life, as provided for by this section of our bill of rights, if any quack has the absolute right to destroy life by his attempt to practice medicine? The legislature therefore in declaring what shall be the qualifications of a person, before he shall acquire property by practicing medicine, does not violate this provision of our bill of rights.

Of course the courts have no right to decide or consider, whether the legislature has acted wisely in determining, what are the requisite qualifications, which one must possess, before he can practice medicine, or whether the legislature has adopted a wise mode of determining, whether such

qualifications are possessed by one who wishes to practice medicine. This is obviously a purely legislative question. For this court to undertake to say, that the legislative act fixing these qualifications and declaring how they are to be shown to exist was to be treated as a nullity, and that the courts should, as insisted by counsel, themselves determine, whether such qualifications existed in each particular case, would be a bold usurpation of authority by this Court, and would directly violate Article V. of our constitution (Acts of 1872-3, page 11), which declares: "The legislative, executive and judicial departments shall be separate and distinct, so that neither shall exercise the power properly belonging to the other."

This section 1 of our bill of rights is probably the only one peculiar to this state, which would be supposed to have any effect on the question, whether the legislature had a right to pass sections 9 and 15 of chapter 93 of the Acts of 1882. The truth is, that this and other general declarations of rights relied on by the counsel for the plaintiff in error as well as numerous general declarations of rights laid down by text-writers and relied on by the counsel for the plaintiff in error have really no bearing on the question under discussion. If this Court should under any such law and general declarations, as to what should be proper functions of government, undertake to declare void an act of the legislature, which according to our notions violated these indefinite fundamental principles of government, simply because we deemed the legislative action though within the scope of their authority arbitrary, unjust or oppressive, we would ourselves be clearly usurping authority; and I can not see that the situation of our citizens would be improved by being subject to the arbitrary and unlimited control of the courts. On the contrary it seems to me, that this would constitute the worst of all tyrannies.

It is complained that the State Board of Health created by chapter 93 of Acts of 1882, and by this section 9 are made autocrats with arbitrary and tyrannical powers conferred on them; and that they can at pleasure decide what college is a reputable college. This provision of the law, if objectionable at all, can only be found fault with, because what constitutes

a reputable college as distinguished from a disreputable one is so vague, as necessarily to leave to the members of the Board of Health a rather indefinite discretion. But it is on this account not more objectionable than a discretion conferred on medical examiners to decide whether the applicant possesses a moral character, and yet statute-laws containing such a provision have been sustained as valid. (*Thompson* v. *Huger*, 25 Me. 104, and *Wert* v. *Clutter*, 37 Ohio St. 347.)

This objection has not, however, been specially argued by the counsel for the plaintiff in error. His argument has been based on what seems to me to be a total misapprehension of the distinction, which must always be respected in every republican government, between questions, which are legislative, and those which are judicial. His arguments based on general principles laid down by text-writers as to the legitimate functions of government are arguments, which should be addressed to the legislature and not to the courts. As a specimen of them I will quote briefly from his written brief. He charges, that the powers conferred on the Board of Health are arbitrary and tyrannical, because, to use his language, they are authorized " to decide what are the necessary qualifications in each individual case, and admit or reject the applicant, as they see fit. They may admit to practice an applicant who does not know his stomach from his brains, or through ill-will, party influence or a domineering spirit reject an applicant, who may know more and be a better practitioner than the combined board." These may be sound reasons, why the legislature should have guarded as far as possible in the law against such evils, but they are very poor reasons, why no such law should be passed. It is obvious that every law, no matter how necessary, may be executed by those entrusted with carrying it out in an unjust and oppressive manner. The legislature in this case seems to have considered well the necessity of avoiding the unjust, foolish and oppressive execution of this law, as far as it could be done, by providing that the members of this Board of Health should be appointed by the Governor, and that as officers of the State they should take an oath to faithfully perform their duties, and that they should be graduates of a respectable medical college, who had practiced medicine continuously for not less than twelve

years.   As a further preventive of abuses each  of  the mem-
bers of this board is removable at the pleasure of the Governor.
If these provisions should  prove  inadequate to prevent  the
abuse of their  power,  the  legislature must  be applied to by
those  who  are  injured to  provide  other precautions, or,  if
necessary, to repeal the law.   But while  it remains a law, it
must be enforced by the courts.

For  these reasons I. am of  opinion  that the  judgment
of the circuit court of April 12,  1883,  must  be  affirmed ;
and that the defendant in  error must recover of the plaintiff
in error its costs in this  Court  expended, and  thirty dollars
damages.

AFFIRMED.

# WHEELING.

