The State ex rel. Kellogg vs. Currens and others.

THE STATE EX REL. KELLOGG, Appellant, vs. CURRENS and others, The Wisconsin Board of Medical Examiners, Respondents.

*September 9 — October 15, 1901.*

*Constitutional law: Police power: Infringement of individual liberty: Right to practice medicine: Reasonableness of classification: Who may question constitutionality of law.*

1. Some classes of citizens may by law enjoy greater privileges than others or be subjected to different burdens or restrictions, provided the classification be not arbitrary and for the purpose of discrimination only, but be made upon grounds and in recognition of conditions or characteristics which are germane to a legitimate object of police regulation. Thus, in the exercise of the police power, the legislature may by law exclude unfit and incompetent persons from the practice of medicine in this state.

2. The sufficiency of the reasons for a classification of persons in respect to privileges or restrictions is for the legislature, not for the courts; and only in a case clear beyond a reasonable doubt will the courts declare a statute invalid on the ground that its purpose or the classifications it makes are without reason to support them.

3. Ch. 306, Laws of 1901, requires all persons commencing the practice of medicine or surgery in this state to submit to an examination by the board of medical examiners, and to present a diploma from a reputable medical college which requires certain specified courses before graduation, and to pay certain fees for the examination and certificate, but provides that any student who, at the date of the enactment, was matriculated in any medical college of this state which requires certain courses of study, shall, on presentation of his diploma from such college and payment of the fees, be admitted to practice without further examination. *Held,* that the act is not in violation of sec. 2, art. IV, Const. of U. S. (which provides that the citizens of each state shall be entitled to all the privileges and immunities of citizens in the several states), nor of the XIVth amendment, Const. of U. S. (which prohibits any state from making or enforcing any law which shall abridge the privileges or immunities of citizens of the United States, and provides that no state shall " deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws "), nor of sec. 1, art. I,

The State ex rel. Kellogg vs. Currens and others.

Const. of Wis. (which declares that "all men are born equally free and independent, and have certain inherent rights; among which are life, liberty and the pursuit of happiness ").

4. Where a relator is seeking to compel the issuance to him of a license to practice medicine under a law of this state, he cannot be heard to assail the validity of a provision of that law on the ground that it is unconstitutional.

5. Statutes will not be declared unconstitutional at the suit of one who is not a sufferer from their unconstitutional provisions.

APPEAL from a judgment of the circuit court for Dane county: R. G. SIEBECKER, Circuit Judge. *Affirmed.*

The appeal is from a judgment quashing the relation and alternative writ of *mandamus.* The relation set forth that the relator was a citizen of Wisconsin, and graduate of and holding diploma from the College of Physicians and Surgeons, a reputable and regularly incorporated medical college located at Chicago, in the state of Illinois, requiring, as prerequisite of graduation, four courses of not less than six months each, no two to be taken within twelve months; that relator matriculated in 1897, and took one course of six months at the Milwaukee Medical College, a reputable medical college of the state of Wisconsin, having the same requirements; that on June 5, 1901, relator presented to the respondent board application for license to practice, accompanied with the fee of five dollars, such application showing the foregoing and other necessary facts under the statute; that the board received, accepted, and retained said application and fee, received and examined his diploma, and refused to grant the license, except upon the condition, alleged to be unlawful and wrongful, that the relator first pay to the treasurer of said board the further sum of ten dollars and pass an examination by said board, justifying their action under ch. 306, Laws of 1901, which the relation alleges is unconstitutional and void. An alternative writ of *mandamus* was issued upon this application, commanding the Wisconsin board of medical examiners to grant re-

lator a license to practice medicine and surgery in the state of Wisconsin, or show cause.

For the appellant there was a brief by *A. F. Kellogg* and *Fowler & McNamara*, and oral argument by *C. A. Fowler*.

For the respondents there was a brief by the *Attorney General*, and oral argument by *R. F. Hamilton*, second assistant attorney general.

DODGE, J. Under the pre-existing statute (sec. 1435*b*, Stats. 1898), relator would have been entitled to a license to commence practice either upon production of such diploma as he now holds, or upon passing examination. By the amendment of 1901 (ch. 306), *both* diploma and examination were made prerequisite to license to beginners, with proviso that "any student who is now matriculated in any medical college of this state which requires [specified courses of study], shall, on presentation of his diploma from such medical college and on payment of the fees specified in this act, be admitted to practice without further examination." "The fee for such examination shall be fixed by the board, but shall not exceed ten dollars, and five dollars additional for the certificate if issued." Other provisions of the act of 1901 may be passed for the present. The appellant contends that the amending act is void because violative of sec. 2, art. IV, of the constitution of the United States, of the fourteenth amendment to that constitution, and of sec. 1, art. I, of the constitution of Wisconsin.

It needs but a glance at the statute in question to satisfy the reader that it does not infringe either sec. 2 of article IV of the federal constitution, which provides that the citizens of each state shall be entitled to all the privileges and immunities of citizens in the several states, nor that part of the fourteenth amendment which prohibits any state to make or enforce any law which shall abridge the privileges or immunities of citizens of the United States. It is obvious

that no discrimination is made for or against any person by reason of citizenship. Exactly the same rights to license are conferred upon the citizens of other states as are conferred upon the citizens of Wisconsin. The classification of the persons who may and those who may not be admitted to practice medicine is upon lines entirely independent of citizenship. True, some people are excluded from the privilege of practicing medicine in Wisconsin, but it cannot be said that thereby is any one abridged of privileges or immunities belonging to him as a citizen of the United States. Those privileges and immunities do not include the right to practice medicine, any more than the right to practice law, within one of the several states. *Bradwell v. State*, 16 Wall. 130, 139; *In re Lockwood*, 154 U. S. 116; Cooley, Torts (2d ed.), 341; *People v. Hasbrouck*, 11 Utah, 291, 303; *Harding v. People*, 10 Colo. 387, 391.

The more strenuous contention, however, rests upon the other portion of the fourteenth amendment, to the effect that no state shall " deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws." This clause is of the broadest and most sweeping, and has served to warrant the supreme court of the United States in reviewing and considering more state legislation than has almost any other provision of the federal constitution. It is not conceived, however, that this enactment by the nation placed any new limitations upon the legislature of this state, for, in the light of several decisions of this court, the very first paragraph of our declaration of rights has been held a substantially equivalent limitation. That clause but phrases the spirit of the Declaration of Independence, and declares: " All men are born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness; to secure these rights, governments are instituted among men, deriving their just powers from the

consent of the governed." This has been held to so declare the spirit of our state constitution that legislative enactments violative of its general principle must be declared void, as beyond the powers vested in its legislature. *Durkee v. Janesville*, 28 Wis. 464, 468; *Hincks v. Milwaukee*, 46 Wis. 559, 566; *Janesville v. Carpenter*, 77 Wis. 288, 302; *Anderton v. Milwaukee*, 82 Wis. 279. It is thus apparent that long before the enactment of the fourteenth amendment, as well as since that time, our legislature was bound to accord to all persons within its jurisdiction the equal protection of the laws, and to refrain from legislation which deprived any of them of life, liberty, or the pursuit of happiness.

These limitations, however, according to all the authorities, state and federal, are to be read as not extending so far as to deprive the states of their power to so control the conduct of individuals as to protect the welfare of the community,— a power commonly described as the "police power." From the earliest days classification has been made by legislatures whereby some people have rights or suffer burdens which others do not,— the criminal may be deprived of his liberty, while the innocent man is free; the minor may be deprived of suffrage, while the adult is privileged to vote; the imbecile or the infant may be deprived of control over his property, while others are not; the owner of real estate in crowded cities may be subjected to burdens and restrictions not imposed upon his rural fellow citizen. These are but illustrations of the application of what is known as the "police power," whereby, strictly speaking, the laws affect different individuals differently, and whereby, in some measure, certain individuals are incidentally deprived of liberty or property, and are restrained in the pursuit of happiness. Hence courts have struggled well-nigh since the commencement of our government to define the line of demarkation between what is permitted and what is forbidden to the legislature by the constitutional restrictions

above referred to, and it has been decided with substantial unanimity that upon those subjects wherein the welfare of the community at large is jeopardized by unrestrained freedom of will and action in every individual the legislature may impose restraints, and that such restraining laws are within the constitutional requirement of uniformity and equality between individuals if they affect all individuals who are situated and conditioned alike with reference to the subject under consideration; that, from the nature of things, class legislation, strictly speaking, must exist; that some classes of our citizens may safely enjoy greater privileges, and other classes may be placed under different burdens and restrictions, as in the illustrations above recited. But equal concurrence is found in the judicial holdings to the effect that such classifications must not be arbitrary and for the purpose of discrimination only, but must be made upon grounds and in recognition of conditions or characteristics which are germane to a legitimate object of police legislation; that, while it is permissible to classify people with reference to the right of suffrage by age or by education, it is not permitted to exclude from that right some classes of individuals who are not distinguished from others by characteristics in some way affecting their ability to safely exercise suffrage; that, while the people may be classified upon the line of mental competency in permitting or restricting them as to their control over their property, it is not permitted to the legislature to classify them upon arbitrary lines of complexion or other discriminating circumstances not affecting their ability in that direction. *Ex parte Garland*, 4 Wall. 333; *Yick Wo v. Hopkins*, 118 U. S. 356, 369; *Dent v. West Virginia*, 129 U. S. 114; *Crowley v. Christensen*, 137 U. S. 86, 89; *Baker v. State*, 54 Wis. 368; *State v. Heinemann*, 80 Wis. 253; *State ex rel. Garrabad v. Dering*, 84 Wis. 585; *Bittenhaus v. Johnston*, 92 Wis. 588, 595; *State ex rel. Adams v. Burdge*, 95 Wis. 390; *State ex rel. Winkler v. Benzenberg*, 101 Wis. 172.

It is not necessary to carry the discussion of these general and elementary subjects further. The lines have been drawn and the landmarks pointed out in a multitude of decisions, a few of which are cited above. Among the decisions are very many recognizing that in the exercise of some of the learned professions — notably the practice of the law and the practice of medicine — the peril to the community at large from the presence of unfit and incompetent practitioners fully justifies restriction by the legislature, under its police power, to exclude the latter. This has already been recognized in Wisconsin, and we need not devote space to the reasons therefor. *People v. Hasbrouck*, 11 Utah, 291; *Dent v. West Virginia*, 129 U. S. 114; *State v. Dent*, 25 W. Va. 1; *Ex parte Spinney*, 10 Nev. 323; *Hewitt v. Charier*, 16 Pick. 353; *State v. Vandersluis*, 42 Minn. 129; *People v. Phippin*, 70 Mich. 6; *State v. Heinemann*, 80 Wis. 253; *State ex rel. Walker v. Green*, 112 Ind. 462. From these decisions there can be no doubt that it is within the proper power of the legislature to provide that some people may and some may not practice medicine, provided that the characteristics and conditions distinguishing the former class from the latter are of a kind tending to make their exercise of that profession more beneficial or less perilous to the community than the class excluded.

In the light of these general conclusions, we turn to a consideration of the statute before us, and appellant's assault thereon. The *gravamen* of his complaint is that he is refused a license to practice medicine in Wisconsin except upon the condition of passing an examination before a medical board created therefor, and paying a fee which we must consider as but compensation for the service of holding that examination. *State v. Heinemann*, 80 Wis. 253; *People v. Hasbrouck*, 11 Utah, 291; *State v. Forcier*, 65 N. H. 42. In this restriction upon his freedom to practice medicine there is certainly no improper invasion of individual rights.

The requirement that one establish his educational qualifications by submitting to an examination is one which pertains directly to one of the characteristics which should distinguish those permitted to practice medicine from those not permitted.    It cannot be doubted that, as a class, those who are able to and have successfully passed a given examination upon technical subjects are better educated upon those subjects than the class of people who have not passed such examination.    But relator complains that he is denied the equal protection of the laws, and is deprived of his liberty unequally, because others who have not passed such examination are by the same law to be admitted to practice.    This complaint is of force, unless those so permitted to practice without an examination are distinguished as a class from the class to which relator belongs by some condition or characteristic which at least may, in the sound and honest opinion of the legislature, tend to mark them as having superior qualifications to safely practice medicine in this state.    This brings us to a consideration of how those who may enter upon the profession without examination are distinguished from the class to which relator belongs, members of which are required to be examined.

The statutory exception from examination quoted in the statement of facts makes a class of those who at the date of enactment were matriculated in any medical college of this state having a specified course, and who should thereafter obtain and present its diploma; in other words, of those who should obtain the education afforded by the then existing medical colleges in this state of a specified standard.    Are there any respects in which this class may by reasonable men be thought to differ from the class of graduates of medical colleges outside of this state, with reference to their fitness to commence practice here?    The reasons for a given statute are for the legislature, if there are any which can

fairly have weight. They are not for the courts. The latter have no control over the validity of a law unless they can say with substantial certainty that no argument or consideration of public policy exists which could have weight with any reasonable and honest man. If any such argument or reason can be suggested, its weight or sufficiency is not debatable in the courts. The existence of legitimate and adequate reasons for any law should not lightly be denied. Human minds differ, and what may seem inadequate or irrelevant to one may seem cogent to another. One is not justified, therefore, in assuming that all who differ from him are unreasonable or are not acting in good faith. It is from such considerations as these that the courts have laid down for themselves the rule that only in a clear case — clear beyond reasonable doubt — will they venture to assert that a law is without reason to support either its purpose or the classifications it may make. *Dickson v. State*, 1 Wis. 122, 126; *State ex rel. Grundt v. Abert*, 32 Wis. 403; *Northwestern Nat. Bank v. Superior*, 103 Wis. 43, 45; *State v. Vandersluis*, 42 Minn. 131; *People v. Phippin*, 70 Mich. 25; *State v. Dent*, 25 W. Va. 21; *Ex parte Spinney*, 10 Nev. 323. May not the legislature of 1901, upon evidence or investigation, have been convinced that the then existing colleges of this state could be trusted to give education to their graduates to make them safe practitioners, while they could not be so satisfied as to all colleges outside this state? The character of the men conducting the former class, the opportunity and right of the legislature to control and to prevent deterioration, the special applicability of the instruction to the diseases or phases of diseases characteristic of Wisconsin,— might not considerations such as these have weight with honest and reasonable minds, and lead them to deem safer the graduates of such institutions, as a class, than those of all other colleges, as to the great majority of which the legislature could neither gain knowledge nor exercise any control? It is no

sufficient argument against this or any classification that it either may or does exclude individuals as well or better qualified than some which it includes; that notoriously some medical colleges outside of Wisconsin furnish as good education as any within it. No classification is perfect. No general line can be drawn that will not present glaring cases of inequality or inconsistency. Many a man who just fails of passing an examination is better qualified than many who succeed. Many a man of twenty is better qualified for suffrage than some on whom the law confers it. Such instances, however, do not deprive the legislature of the power to draw a line of classification at the age of twenty-one, nor can those now urged upon us of themselves make classification according to a state line unconstitutional. *Ex parte Spinney*, 10 Nev. 327.

Numerous instances of legislation recognizing confidence in state institutions as a ground of classification are familiar. Very many states (Wisconsin included) recognize the diploma of one or more law schools within the state as making a legitimate class for exemption from examination, and have done so since their early history. As early as 1818 Massachusetts recognized the diploma of Harvard Medical School, or the approval of the State Medical Society, as a proper ground of classification for practice of medicine, and was upheld in so doing by the supreme court of that state, speaking by SHAW, C. J. *Hewitt v. Charier*, 16 Pick. 353. See, also, *Wright v. Lanckton*, 19 Pick. 288. Maine recognized approval of the Maine Medical Association as a ground of classification, and the law has been sustained by the courts, though without debate on the question now in hand. *Bibber v. Simpson*, 59 Me. 181. Alabama admits on the faith of a certificate from the Medical Association of the State of Alabama, also on diploma of any medical college in the United States, and the constitutionality of the law has been declared. *Brooks v. State*, 88 Ala.

122. Indiana distinguishes applicants approved by the State Dental Association. *Wilkins v. State*, 113 Ind. 514. Several states make the fact of practicing therein at the date of the law a sufficient reason for exemption from examination. *State v. Creditor*, 44 Kan. 565. Maryland finds a legitimate distinction between graduates of a " university or college authorized to grant diplomas in dental surgery " and those of "a regular college of dentistry." *State v. Knowles*, 90 Md. 646, 656.

Numerous other illustrations might be found of distinctions for which the reasons would seem extremely doubtful and remote, but as to which the courts have felt unauthorized to deny that the legislature might have found some which satisfied its judgment. We are unable to say that the legislature of 1901 could have had no reason which it deemed cogent and relevant to the protection of the public in requiring graduates of medical colleges outside this state to be examined, while it excepted from that requirement graduates of Wisconsin colleges who were matriculated at the time of legislation. Being so unable so to say, we must recognize this act as within the power of the legislature in a well-recognized field of police regulation, and not denying to any similarly circumstanced and conditioned privileges or protection accorded to others.

Relator points out one other respect in which he contends he and the class to which he belongs are unreasonably discriminated against, namely, a provision of our statute that any practitioner of medicine holding a certificate from any other state board imposing requirements equal to those established by the board provided for therein may, on presentation of same with a diploma, be admitted to practice in this state without an examination, at the discretion of the board, on payment of the fee. Without stopping now to consider whether the legislature might not have considered the fact of the approval of such applicants by the state board

of another state sufficient evidence of their qualification, it is sufficient to say that this provision is not a part of the new enactment of 1901, but was a part of the former section (sec. 1435*b*, Stats. 1898), under which relator is claiming the right to compel the state board to issue to him a certificate. His only right to a certificate depends upon the validity, therefore, of a statute containing this provision, and he cannot be heard to assail its validity. *Hart v. Folsom* (N. H.), 47 Atl. Rep. 603. Were he being prosecuted for practicing medicine without a certificate, he would be in a different situation.

Some ten other grounds of attack upon the statute are assigned and argued, but none of them, even if well assigned, affects the relator. His only legitimate ground of complaint is that he is required to submit to examination, and he is not affected by the fact that others, who are also required to submit to examination, are not required to present the same educational qualifications as he has presented. Except as to the two classes above discussed, all other persons seeking to commence the practice of medicine in the state of Wisconsin are subject to the requirement now made of the relator,— that they submit to an examination before the state board. Statutes are not to be declared unconstitutional at the suit of one who is not a sufferer from their unconstitutional provisions. The fact, if it were a fact, that less educational requirements are demanded from osteopaths as preliminary to an examination by the board, in no wise affects the relator, whose qualifications for admission are, as he alleges in his relation, all conceded, except the passing of the examination. The question whether the requirement of a diploma is an unconstitutional one, as discriminating against those who by some other method of study have acquired equal education, is not open to the relator, who confessedly has his diploma. We cannot set aside the acts of the legislature at the suit of one who, suffering no wrong himself, merely

assumes to champion the wrongs of others. We therefore refrain at the present time from the examination of the details of these various parts of this complicated statute.

*By the Court.*— Judgment affirmed.