## THE PEOPLE v. WILLIAM W. PHIPPIN.

*Constitutional law—Title of act—Unlawful practice of medicine—*
*Pleading—Exception in statute—Evidence.*

1. The object of Act No. 167, Laws of 1883, is fairly indicated in its title, "An act to promote public health," and the body of the act is not inconsistent or incongruous with such title.

2. Act No. 167, Laws of 1883, is *not* unconstitutional as in conflict with section 2, Art. 4, of the United States Constitution, which guarantees to the citizens of *each* state *all* of the privileges and immunities of citizens in the *several* states; nor does it conflict with section 1, Art. 14, of the amendments to such Constitution, by

abridging the privileges or immunities of citizens of the United States, or by depriving any person of life, liberty, or property without due process of law, or by denying to any person within the jurisdiction of Michigan the equal protection of the laws (CAMPBELL and MORSE, JJ., dissenting).

3. The practice of *dentistry* is not the practice of medicine, nor included in the *latter* idea, and a complaint under Act No. 167, Laws of 1883, charging respondent with holding himself out to the public as authorized to *practice medicine*, negatives his being a *dentist*, which fact need not be alleged.

4. A party pleading a statute containing an exception in the *enacting* clause must show that his adversary is not within the exception, but an exception in a *subsequent* clause or statute is matter of defense, to be shown by the other party.

5. A complaint under Act No. 167, Laws of 1883, need not allege—

*a*—That the respondent was *not* practicing with and under the instruction of any person legally qualified to practice medicine and surgery; nor—

*b*—That he had *not* obtained his permit to practice from the county clerk, etc.; nor—

*c*—On whom and by what means he practiced medicine.

6. The evidence in this case (see opinion) is held sufficient to warrant the jury in finding that respondent advertised himself and held himself out to practice medicine.

7. Act No. 268, Laws of 1887, amends sections 2 and 3 of Act No. 167, Laws of 1883, but does not repeal said act.

Error to Kent. (Montgomery, J.) Argued January 26, 1888. Decided April 27, 1888.

Respondent was convicted of unlawfully holding himself out to practice medicine, etc., and fined five dollars and costs of prosecution, and the judgment was affirmed. The facts, and points of counsel, are stated in the opinion.

*C. C. Howell,* for respondent.

*Moses Taggart,* Attorney General, and *Samuel D. Clay,* Prosecuting Attorney, for the people.

[The authorities cited by counsel, as also others bearing upon the case, are so thoroughly reviewed in the opinion, that their restatement is omitted.—REPORTER.]

Long, J. This respondent was arrested on July 28, 1887, for unlawfully advertising and holding himself out to practice medicine between June 29 and July 28, 1887, under Act No. 167, Laws of 1883, entitled "An act to promote public health."

The complaint charges, in substance, that on June 29, and between that day and the date of making this complaint (July 28), at the city of Grand Rapids, in the county of Kent, one William W. Phippin did then and there advertise and hold himself out to the public as authorized to practice medicine, and did practice medicine, in the city, county, and State aforesaid, without having the qualification required by law so to do, to wit, he not having practiced medicine continuously for five years in this State, and not being a graduate of any legally authorized medical college in said State, or in any of the United States, or in any other country, against the form of the statute, etc.

The portions of the statute bearing upon this action read as follows:

"Sec. 1. *The People of the State of Michigan enact,* That from and after this act shall take effect it shall not be lawful for any person to practice medicine or surgery, or any branch thereof (except dentistry), in this State without having the qualifications required in the provisions of this act, and without having first registered in the office of the county clerk as provided in this act.

"Sec. 2. The necessary qualifications to practice medicine in this State shall be:

"*First.* That every person who shall have actually practiced medicine continuously for at least five years in this State, and who is practicing when this act shall take effect, shall be deemed qualified to practice medicine in this State, after having registered in the office of the county clerk as provided by this act.

"*Second.* Every graduate of any legally authorized medical college in this State, or in any one of the United States, or in any other country, shall be deemed qualified to practice medicine and surgery in all its departments, after having registered as provided by this act: *Provided,* That the provisions

of this act shall not be construed so as to prohibit any student or under-graduate from practicing with and under the instruction of any person legally qualified to practice medicine and surgery under and by the provisions of this act.

"*Provided*, That every person qualified to practice medicine and surgery under the provisions of this act shall, within three months after this act shall take effect, file with the county clerk of the county wherein he has been engaged in practice, or in which he intends to practice, a statement, sworn to, * * * setting forth, first, if he is actually engaged in practice in said county, the length of time he has been engaged in such continuous practice, and, if a graduate of any medical college, the name of the same, and where located," etc.

"Sec. 6. Whoever advertises or holds himself out to the public as authorized to practice medicine or surgery in this State, when in fact he is not so authorized under the provisions of this act, shall be deemed guilty of a misdemeanor, and on conviction thereof shall be liable to a fine of not less than five dollars, nor more than fifty dollars, for each offense."

The respondent was tried and convicted upon such complaint, and the warrant issued thereon, before the police court of Grand Rapids, and appealed to the circuit court for the county of Kent.

Before the trial of the cause in the circuit court, a motion was made to dismiss the complaint and warrant, quash the proceedings, and discharge the respondent, for the following reasons:

"1. That there is no offense charged in said complaint under any law of this State, in this, to wit:

"*a*—It does not allege that defendant was not practicing with and under the instructions of any person legally qualified to practice medicine and surgery under the provisions of Act 167, Laws of 1883.

"*b*—It does not allege that he has not obtained his permit to practice from the county clerk, by filing with said clerk his sworn statement which would entitle him to practice medicine and surgery, and authorize him to do so, nor does it allege he was not a dentist.

"*c*—It is not alleged on whom he practiced medicine, and by what means it is claimed he practiced medicine; and it is without proper averment of time, place, person, or circumstance.

"2. The law under which this suit was begun has been repealed, and this defendant should be discharged. •

"3. The act under which this prosecution is brought and had is contrary to the provisions of section 2, Art. 4, Const. U. S.; also to the fourteenth amendment thereto.

"4. The object of the act is not expressed in its title, and is therefore void, under section 20, Art. 4, Const. Mich."

The court overruled the motion, and the cause was brought on for trial before a jury, who found the respondent guilty as charged, and the court thereupon adjudged the respondent to pay a fine of $5, and costs of prosecution, taxed at $42, and in default of immediate payment to be forthwith imprisoned in the common jail of said county, etc.

The defendant brings the case to this Court upon writ of error, and assigns as error—

"1. The circuit court erred in not granting respondent's motion to dismiss the complaint and warrant herein, and to quash the proceedings, and discharge the respondent.

"2. The circuit court erred in permitting Exhibits A, B, and C to be read in evidence to the jury.

"3. The circuit court erred in not instructing the jury that there is no proof that between June 29 and July 28 this respondent advertised or held himself out to practice medicine."

We think the complaint sufficiently specific. It is charged that the respondent "Did then and there advertise and hold himself out to the public as authorized to practice medicine, and did practice medicine," etc. It is alleged that the complaint is not sufficiently specific in that it does not allege that respondent was not a dentist. This was not necessary. The language used expressly negatives that fact in charging he held himself out to practice medicine. The practice of dentistry is not the practice of medicine, nor included in the idea of the practice of medicine. If the complaint had been for holding himself out to practice surgery, there might have been some force in the objection, as dentistry may be said to be a branch of surgery, though upon this we express no opinion.

The other objections to the complaint, that it does not charge, "that defendant was not practicing with and under the instructions of any person legally qualified to practice medicine and surgery," and that it does not allege that he has not obtained his permit to practice from the county clerk, by filing with said clerk his sworn statement, which would entitle him to practice medicine and surgery, and authorize him so to do, and that it is not alleged on whom he practiced, and by what means he practiced medicine, are not well taken. The rule of pleading a statute which contains an exception in the *enacting* clause is that the party pleading must show that his adversary is not within the exception; but, if there be an exception in a subsequent clause or subsequent statute, that is a matter of defense, and is to be shown by the other party. *Com. v. Hart,* 11 Cush. 134.

"The reason of this rule is obvious, and is simply this: Unless the exception in the enacting clause of a statute, or in the general clause in a contract, is negatived in pleading the clause, no offense or no cause of action appears in the indictment or declaration when compared with the statute or contract." *Dakota v. Scott,* 2 Dakota, 212 (6 N. W. Rep. 435).

The objection that there was no evidence in the case to go to the jury that respondent advertised or held himself out to practice medicine between June 29 and July 28 has no force. It was shown upon the trial that he was called upon by Mr. Jones to visit his wife, and did visit her, claiming to be a magnetic healer; that Mrs. Jones was sick, and her husband got him to cure her if he could, and he treated her as a magnetic healer. It is also shown that in June or July respondent was called to the house of Mr. Wheeler, and there treated Mrs. Wheeler and child as a magnetic healer. On June 24, 1884, the respondent signed and swore to a paper that purported to be a medical practitioner's sworn statement, and he had a sign out as "Dr. W. W. Phippin, Magnetic Healer."

Mr. Wheeler's child died, and a "certificate of death" was made by the respondent, in which he states:

"Cause of death, chief and determining: Canker sore mouth. Duration of disease: June 3 to July 22, 1887. I certify that I attended the person above named in last illness, who died of the disease above stated on the date above named [July 22, 1887]."

Proof was also offered tending to show that respondent had not practiced medicine continuously for five years in this State, and that he was not a graduate of any legally authorized medical college in said State, or in any of the United States, or in any other country.

Exhibits A, B, and C were properly received and read in evidence. Exhibit A is the medical practitioner's sworn statement, and reads as follows:

"STATE OF MICHIGAN,
"County of Kent.

"I, William Wallace Phippin, do solemnly swear that I am now engaged in the practice of medicine in the county of Kent, State of Michigan; that I have been engaged in the continuous practice of medicine in Canada, county of Huron, nine years; in the State of Michigan for one year.

"WM. WALLACE PHIPPIN,<br>"Medical Practitioner.

"Sworn and subscribed to before me June 24, 1884.
"CORNELIUS L. HARVEY,<br>"Notary Public, Kent Co., Mich.
"Filed June 24, 1884."

Exhibit B is the certificate of death referred to above.

Exhibit C is a report of infectious diseases, and reads as follows:

"GRAND RAPIDS, MICH., 1887.

"*Board of Health:* The following cases of pestilential or infectious diseases have fallen under my care: Name, Arthur Wheeler; age, 20 months; sex, boy; residence, 250 Waterloo St.; taken sick, June 20; disease, measles.
"DR. PHIPPIN."

These exhibits were properly admitted in evidence as tending to show that respondent held himself out to practice medicine; and we think there was evidence tending to show that they were executed by the respondent. All these facts were submitted to the jury under proper instructions from the court, and under the facts so submitted the jury found the respondent guilty.

The claim of respondent's counsel that the law under which the respondent was convicted has been repealed is abandoned on the argument, and needs no further mention. Act No. 268, Laws of 1887, only amends sections 2 and 3 of the act of 1883, but does not repeal the act.

Respondent's counsel also alleges that the object of the act is not expressed in its title, and is therefore void, under section 20, Art. 4, of the Constitution of this State, which provides:

"No law shall embrace more than one object, which shall be expressed in its title," etc.

We think the object is fairly indicated in the title, and the body of the act is not inconsistent or incongruous with the title, and that this objection is not well taken. *People v. Bradley,* 36 Mich. 447; *Conn., etc., Ins. Co. v. Treasurer,* 31 Id. 17, and cases there cited.

We find no error in the record, and the only remaining question is upon the constitutionality of the act itself under which respondent was convicted.

It is claimed by the counsel for the respondent that the act is unconstitutional for the reason that its provisions are in conflict with and repugnant to section 1, Art. 14, of the amendments to the Constitution of the United States, which provides:

"No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property without due process of law, nor deny to any per-

son within its jurisdiction the equal protection of the laws."

It is claimed, also, that its provisions are in conflict with and repugnant to section 2, Art. 4, of the Constitution of the United States, which provides: '

"The citizens of each state shall be entitled to all the privileges and immunities of citizens in the several states."

The attention of the Court is directed by counsal for the respondent to *Welton v. Missouri,* 91 U. S. 275; *Henderson v. Mayor,* 92 Id. 259; *Ward v. Maryland,* 12 Wall. 418; *Ex parte Jacobs,* 98 N. Y. 103.

In *Henderson v. Mayor, supra,* a bill was filed against the mayor and others, in which it is alleged that complainants were the owners of a steam-ship which arrived from Glasgow, Scotland, at New York, on June 24, 1875, having on board a number of immigrant passengers, and among others three persons who came from foreign countries; that by the statutes of New York the master of every vessel arriving at New York shall within 24 hours report in writing the name, birthplace, last residence, and occupation of every passenger who is not a citizen of the United States. The statute then directs the mayor to require the owner or consignee of the vessel to give a bond for every passenger so reported, in a penalty of $300, with two sureties, conditioned to indemnify the commissioners of immigration, and every county, city, and town in the state, against any expense for the relief or support of the persons named in the bond for four years thereafter. Upon failure, the owner or consignee is made liable to a penalty of $500 for every such passenger, which is made a lien on, and may be enforced against, the vessel. The bill was filed to restrain the enforcement of this penalty.

Mr. Justice Miller, delivering the opinion of the Court, held this act to be in violation of section 8, Art. 1, and section 10, subd. 2, of the Constitution of the United States, for the reason that the laws in question are regulations of com-

merce, which a state has no power to make; that this power conferred upon Congress to regulate commerce is exclusive. An examination of these cases will show that these decisions rest upon the ground that the state statutes are void only because Congress, and not the states, was authorized by the Constitution to pass them.

The case of *Welton v. Missouri, supra,* was under a statute of Missouri which requires the payment of a license tax from persons who deal in the sale of goods, wares, and merchandise which are not the growth, produce, or manufacture of the state, by going from place to place in the state to sell the same in the state, and requires no such license tax from persons selling in a similar way goods which are the growth, produce, or manufacture of the state. The Court held this act in conflict with the power vested in Congress to regulate commerce with foreign nations and among the several states.

The case of *Ward v. Maryland, supra,* was under a statute of Maryland which required all traders resident within the state to take out license, and pay therefor certain sums regulated by a sliding scale from $12 to $150, according as their stock in trade might vary from $1,000 to more than $40,000. The statute also made it a penal offense in any person, not being a permanent resident in the state, to sell, offer for sale, or expose for sale, within certain limits within the state, any goods, wares, or merchandise whatever, other than agricultural products and articles manufactured in Maryland, within the said limits, without first obtaining a license so to do, for which license (to be renewed annually) a sum of $300 was to be paid. It was held that this statute imposed a discriminating tax upon non-resident traders, trading in the limits mentioned, and that it was *pro tanto* repugnant to the Federal Constitution, and void.

The case of *Ex parte Jacobs, supra,* was brought under an act of New York, passed in 1884, entitled—

"An act to improve the public health by prohibiting the manufacture of cigars, and preparation of tobacco in any form, in tenement houses in certain cases, and regulating the use of tenement houses in certain cases."

Section 6 of this act provided:

"This act shall apply only to cities having over 500,000 inhabitants."

Mr. Justice Earl, delivering the opinion of the court in this case, says :

"What does this act attempt to do? In form, it makes it a crime for a cigar-maker in New York and Brooklyn, the only cities in the state having a population exceeding 500,-000, to carry on a perfectly lawful trade in his own home. Whether he owns the tenement house, or has hired a room therein for the purpose of prosecuting his trade, he cannot manufacture therein his own tobacco into cigars for his own use or for sale, and he will become a criminal for doing that which is perfectly lawful outside of the two cities named,—everywhere else, so far as we are able to learn, in the whole world."

The learned counsel for the respondent also cites the *Slaughter-house Cases*, 16 Wall. 36. Mr. Justice Miller delivered the opinion of the Court. This case was brought under a statute of Louisiana granting a corporation created by it the exclusive right for 25 years to have and maintain slaughter-houses within the parishes of Orleans, Jefferson, and St. Bernard, and to exact certain prescribed fees for the use of its wharves, and for each animal landed. It was held that this act was a police regulation for the health and comfort of the people (the statute locating them where health and comfort required), and was within the power of the state legislatures, unaffected by the Constitution of the United States; and that such act is not forbidden by sections 1 and 2 of the fourteenth article of amendments to the Constitution.

Mr. Justice Field delivered a dissenting opinion in the cases, which was concurred in by the Chief Justice and Jus-

tices Swayne and Bradley; and subsequently (111 U. S. 757) he says:

"Among these inalienable rights, as proclaimed in that great document [the Declaration of Independence], is the right of men to pursue their happiness, by which is meant the right to pursue any lawful business or vocation, in any manner not inconsistent with the equal rights of others, which may increase their property or develop their faculties, so as to give to them their highest enjoyment. The common business and callings of life, the ordinary trades and pursuits, which are innocuous in themselves, and have been followed in all communities from time immemorial, must therefore be free in this country to all alike upon the same conditions. The right to pursue them without let or hinderance, except that which is applied to all persons of the same age, sex, and condition, is a distinguishing privilege of citizens of the United States, and an essential element of that freedom which they claim as their birthright."

While concurring fully in the views so expressed by Mr. Justice Field, yet there are certain restrictions and limitations upon the judicial branch of state government that must always be borne in mind in its attempt to enforce such rights. Mr. Justice Cooley, in his work on Constitutional Limitations (168), so aptly and fully lays down the rule that we quote his language here:

"The rule of law upon this subject appears to be that, except where the constitution has imposed limits upon the legislative power, it must be considered as practically absolute, whether it operate according to natural justice or not in any particular case. The courts are not the guardians of the rights of the people of the state, except as those rights are secured by some constitutional provision which comes within the judicial cognizance. The protection against unwise or oppressive legislation within constitutional bounds is by an appeal to the justice and patriotism of the representatives of the people. If this fail, the people, in their sovereign capacity, can correct the evil; but courts cannot assume their rights.

"The judiciary can only arrest the execution of a statute when it conflicts with the constitution. It cannot run a race of opinions upon points of rights, reason, and expediency

70 MICH.— 2.

with the law-making power. Any legislative act which does not encroach upon the powers apportioned to the other departments of the government, being *prima facie* valid, must be enforced, unless restrictions upon the legislative authority can be pointed out in the constitution, and the case shown to come within them. If the courts are not at liberty to declare statutes void because of their apparent injustice or impolicy, neither can they do so because they appear to the minds of the judges to violate fundamental principles of republican government, unless it shall be found that those principles are placed beyond legislative encroachment by the constitution."

We have thus briefly reviewed the cases cited by the counsel for the respondent that the distinction might be seen between them and the case under consideration. Statutes very similar to this have been upheld in many of the states, where their constitutionality has been brought in question, and in many of the states very similar statutes have been enforced without question; and we are unable to find a case in the courts of any of our sister states, or in the federal courts, where such statutes have been overturned upon constitutional grounds, as abridging "the privileges or immunities of citizens of the United States," or as "depriving any person of property without due process of law," or as being in conflict with section 2 of article 4, providing that "the citizens of each state shall be entitled to all the privileges and immunities of citizens in the several states."

The several states of the Union possess a general police power, by which persons and property are subjected to all kinds of restraints and burdens, in order to secure the general comfort, health, and prosperity of the state. Whatever differences of opinion may exist as to the extent and boundaries of the police power, and however difficult it may be to render a satisfactory definition of it, there seems to be no doubt that it does extend to the protection of the lives, health, and property of the citizens, and to the preservation of good order and public morals. They belong emphatically

to that class of objects which demand the application of the maxim *salus populi suprema lex;* and they are to be attained and provided for by such appropriate means as the legislative discretion may devise. *Beer Co. v. Massachusetts,* 97 U. S. 32.

A great variety of cases could be enumerated where the state legislatures have required licenses to be granted before persons could engage in certain kinds of business or in certain professions. The practice of the law is a profession which the legislature of every state has deemed one which should be regulated by law, and those engaged in it are under restraint for the protection of the general public. Persons proposing to engage in that profession are required to pass an examination before some court or persons qualified to determine whether the applicant has the qualifications necessary to practice law. The design of this license is to protect the community from the consequences of a want of professional qualifications, and for the reason that none but those who have been specially educated with reference to practicing law can do so without great injury to the community, who must employ lawyers in their business, and who are necessarily incompetent to judge, and who would otherwise be imposed upon by all sorts of pretenders, solicitors for business, and ignorant of their profession. The right of the legislature is universally recognized to restrain persons in their business or professions when the public security or prosperity would be promoted by such restraints. *Goldthwaite v. Montgomery,* 50 Ala. 486; *Cohen v. Wright,* 22 Cal. 322; *State v. Goldman,* 44 Tex. 104; *Sheldon v. Clark,* 1 Johns. 513; *Railroad Co. v. Bacon,* 30 Ill. 347. The legislatures have frequently gone further, and imposed a tax upon persons practicing law, and these laws have been upheld. *State v. Gazlay,* 5 Ohio, 21; *Cousins v. State,* 50 Ala. 113.

There is no good reason why restraints should not be

placed upon the practice of medicine as well as the law. The public are more directly interested in this than in the practice of the law; and persons who engage in this profession require a special education to qualify them to practice. A great majority of the public know little of the anatomy of the human system, or of the nature of the ills that human flesh is heir to; and there is no profession, no occupation or calling, where people may more easily or readily be imposed upon by charlatans. It is almost an every-day experience that people afflicted with disease will purchase and swallow all sorts of nostrums because some quack has recommended it.

Up to the passage of the act in question, the people of this State were wholly unprotected against quackery, except such protection as the common law afforded. As early as 1806, the supreme court of New York affirmed a judgment against a physician, inflicting a fine on him of $25 for practicing medicine contrary to the provisions of an act of the legislature. *Sheldon v. Clark,* 1 Johns. 513. By the terms of this act any person was forbidden to practice physic or surgery without a diploma, and, if he did so, he could not collect his fees as a physician, and was subject to a fine of $25, etc. *Timmerman v. Morrison,* 14 Johns. 369; *Thompson v. Staats,* 15 Wend. 395. And the constitutionality of these statutes has never been questioned. Similar statutes in Massachusetts have been upheld since 1817. *Spaulding v. Alford,* 1 Pick. 33; *Hewitt v. Charier,* 16 Id. 356; *Wright v. Lanckton,* 19 Id. 288.

In Maine the legislature passed the following act (Rev. Stat. Me. 1871, chap. 13, § 3):

"No person except a physician or surgeon who commenced prior to February 16, 1831, or has received a medical degree at a public medical institution in the United States, or a. license from the Maine Medical Association, shall recover any compensation for medical or surgical services, unless previous to such services he had obtained a certificate of good moral

character from the municipal officers of the town where he then resided."

In *Bibber v. Simpson*, 59 Me. 181, it was decided that professional services of a medical clairvoyant were "medical services" within the meaning of this act, and could not be recovered if the clairvoyant had not complied with the act. There was no question or suggestion of the constitutionality of this act.

The legislature of Texas, in 1876, passed an act to regulate the practice of medicine, which provided, among other things, that no one should practice medicine without having a certificate from some authorized board of medical advisers, as provided by this act, and subjecting any one who did to be fined. In *Antle v. State*, 6 Tex. App. 202, the court affirmed a judgment inflicting a fine of $50 on a doctor who had violated this law. See, also, *State v. Goldman*, 44 Tex. 104.

On May 5, 1868, the legislature of Ohio passed "An act to protect the citizens of Ohio from empiricism, and elevate the standing of the medical profession." This act provides—

"That it shall be unlawful for any person within the limits of said state who has not attended two full courses of instruction, and graduated, at some school of medicine, either of the United States or some foreign country, or who cannot produce a certificate of qualification from some state or county medical society, and is not a person of good moral character, to practice medicine in any of its departments: * * * *Provided*, That, in all cases when any person has been continuously engaged in the practice of medicine for a period of ten years or more, he shall be considered to have complied with the provisions of this act; and that, where persons have been in continuous practice of medicine for five years or more, they shall be allowed two years in which to comply with such provisions."

Section 2 of this act provides that any person violating the provisions of the act shall, upon conviction thereof, be fined not less than $50 nor more than $100, and, upon conviction of a second violation, in addition to above fine, be imprisoned

in the county jail for the term of 30 days; and any person violating the provisions of the act was prohibited from collecting his fees, etc

In *Wert v. Clutter*, 37 Ohio St. 348, this statute came under consideration, and the court say:

"This statute was not intended to create a right in any one to practice medicine. It was simply intended to prohibit the exercise of the right (which before was universal) by unqualified persons. The right remains in all persons, except those from whom it is taken away by the statute, and it is not taken away from a person who at any time has been in the continuous practice for ten years or more."

This act was assumed as a matter of course to be valid.

A conviction was sustained in Missouri under an indictment against the defendant for practicing medicine without a license, in violation of "An act to sustain the credit of the state." *State v. Hale*, 15 Mo. 607.

In 1883, the legislature of Minnesota passed an act to regulate the practice of medicine in the state of Minnesota, which provided that every person practicing medicine in any of its departments shall possess the qualifications required by this act. The act created a state board of medical examiners, and required all persons, except such as had been practicing medicine for *five years within the state*, as a condition to their right to practice, to obtain from this board, after examination, its certificate of their qualification, unless the person was a graduate of a school or medical college, and had a diploma, which had been presented to this board. Chapter 125, Act of 1883.

In *State v. Board*, 32 Minn. 324 (20 N. W. Rep. 238), the constitutionality of this act came before the supreme court of that state, and was held valid; and in that connection the court say:

"It cannot be doubted that the legislature has authority, in the exercise of its general police power, to make such reasonable requirements as may be calculated to bar from

admission to this profession dishonorable men, whose principles or practices are such as to render them unfit to be intrusted with the discharge of its duties."

The act came before that court again in the case of *State v. Board*, 34 Minn. 387 (26 N. W. Rep. 123), and the former case was cited and approved.

Illinois, Alabama, and Georgia have somewhat similar statutes, and the courts have held them valid, when the question of their constitutionality has arisen. *Richardson v. Dorman*, 28 Ala. 679.

*State v. Green*, 112 Ind. 462 (14 N. E. Rep. 352), holds that the Indiana act of April 11, 1885, making residence in that state for a certain number of years one of the necessary qualifications of an applicant for a license to practice medicine, is not repugnant to section 2, Art. 4, nor to section 1, Art. 14, of the United States Constitution, as granting privileges or immunities to citizens of Indiana not given to citizens of other states.

An examination of this act will, in our opinion, not disclose any violation of the provisions of the Constitution. What are the qualifications necessary to practice in this State? Every graduate of any legally authorized medical college *in this State*, or in *any* of the *United States*, or *in any other country*, after having registered, etc., may practice in this State. It must be conceded, from cases cited, that the Legislature has power to define the qualifications of those who shall be licensed to practice those callings or professions the exercise of which may affect the public health or safety, and that this law would be entirely constitutional in that view if it stopped short with prohibiting all except medical graduates from practicing.

But it is contended that the exception in favor of those who come under subdivision 1, § 2, of the act,—

" That every person who shall have actually practiced medicine continuously for at least five years in this State, and

who is practicing when this act shall take effect, shall be deemed qualified," etc.,—

Is not founded upon any natural, fair, or reasonable distinction, and makes it a discriminating law, within the prohibitions of the Federal Constitution. This question was raised in *Ex parte Spinney*, 10 Nev. 328; and Mr. Justice Beatty, delivering the opinion of the court in that case, says:

"The second point was more strenuously insisted upon; the petitioner contending that there cannot be any reasonable ground for a distinction between those who have practiced ten years in this state and those who have practiced ten years elsewhere.    But I am not prepared to say that there may not be grounds for such a distinction.    *    *    *    The legislature may have thought the graduate is a man of science; his knowledge enables him to refer effects to their causes; it enables him to discriminate between the essential relations of *phenomena*, and their accidental coincidence; it is sufficiently comprehensive to anticipate the operation of new causes, and the influence of changed conditions; he will therefore be able to adapt his practice to the peculiar diseases or modification of diseases of any locality.

"The mere practitioner, on the other hand, who has not pursued the regular course of medical education, and who has learned merely to meet a certain symptom with a certain drug, without knowing what pathological condition is indicated by the symptom, or what is the specific action of the drug, may do very well in the diseases he is accustomed to, or where the same symptom means the same thing, and the accustomed remedy meets the same counteracting or co-operating conditions; but he will be dangerous among new diseases, or new modifications of disease.    *    *    *    How much truth there may be in these suggestions, or how important it may be as a principle of discrimination, was a question solely for the legislature.    *    *    *    The question was one of policy, and its decision is not subject to our review."

This act does not prohibit any physician or surgeon from practice of medicine or surgery because he is not a citizen of this State; it makes a medical qualification the test of the

right to practice. The real test of the right to practice is that he shall be a—

"Graduate of any legally authorized medical college in this State, or in any one of the United States, or in any other country."

And in this there is no discrimination. Now, the Legislature saw fit, in establishing this test, to except from its provisions a certain class of physicians and surgeons. In so doing it in effect declared that the physician or surgeon who had actually practiced medicine continuously for at least five years in this State, and who is practicing when this act shall take effect, was as well qualified, in its judgment, to continue the practice of his profession as the student coming fresh from the halls of college with his diploma was to commence it. The reasons which induced the Legislature to insert the exception may have been as varied as the different minds of its members. It certainly had power to insert it, and whether the power was reasonably or unreasonably exercised, or whether it was expedient to enact the law, are questions exclusively within the province of the legislative branch of the State government, and their judgment must necessarily be decisive upon these questions. *State v. Dent*, 25 W. Va. 1; *Ex parte Spinney*, 10 Nev. 328; *Wert v. Clutter*, 37 Ohio St. 347.

Counsel for respondent lays some stress upon the fact that whereas the statute provides—

"That every person qualified to practice medicine and surgery under the provisions of this act shall, within three months after this act shall take effect, file with the county clerk of the county   *   *   *   a statement sworn to," etc.,—

For that reason all persons would be disqualified who had not within that time filed such statement. This provision, evidently, was only intended to apply to those actually engaged in the practice when the act took effect, granting

them three months in which to file their sworn statements, and those who subsequently proposed to engage in the practice are compelled to file such sworn statement before actually engaging therein.   The respondent is not charged with having practiced medicine without first having filed such sworn statement, etc., and that question does not arise in this case.   That provision as to the time of filing such statement might, however, be held void, and the balance of the act upheld.   *Smith v. Adrian,* 1 Mich. 495; *Ames v. Booming Co.,* 11 Id. 139.

For the reasons herein expressed we are of the opinion that the respondent was properly convicted, and the judgment of the court below is therefore affirmed.

SHERWOOD, C. J., and CHAMPLIN, J., concurred with LONG, J.

CAMPBELL, J., (*dissenting*).   Respondent was convicted and sentenced for holding himself out as a medical practitioner, not coming within the terms of the act of 1883, entitled "An act to promote public health."   Laws of 1883, p. 178.   The sworn certificate, filed by him with the clerk of Kent county, shows that he has been a regular practitioner, continuously, for ten years, nine years in Canada and one year in Michigan.

Various errors are assigned on the record, but the only points which I am disposed to notice are those relating to the validity of the statute.   This is claimed to be invalid as not conforming to its title, and as depriving persons of their legal privileges.

The title, as before mentioned, is "An act to promote public health."   The only contents of the statute relate to the conditions on which persons may practice medicine.

Those conditions are that no one can practice any branch of medicine or surgery but dentistry except on these qualifications:

1. He must register in the county clerk's office within three months after the law took effect. There is no provision for any registry at any time thereafter, either in the original act or in its amendment in 1887. Laws of 1887, p. 359. And there is no saving clause for sickness, absence, or any other excuse leaving it possible or impossible.

2. No one who is not a graduate of a medical college can practice unless he had practiced continuously in Michigan for at least five years at the time the law took effect, and was then practicing.

3. Any graduate of any medical college in or out of the United States may practice on registry.

4. Any student under the instruction of a person entitled to practice as the law stood till 1887, and any student under the immediate supervision of such person under the law of. 1887, may practice without reference to the length of his studentship.

5. There is no restriction of age in practitioners or students.

6. Practitioners not authorized by the statute are punishable criminally.

In my opinion, the statute is bad for want of a proper title, and is invalid for other reasons. The language of the Constitution, frequently quoted, is.

" No law shall embrace more than one object, which shall be expressed in its title."

This means, as has been uniformly held, that the subject-matter of the statute must be such as would be fairly suggested by the title. There may be many details and collateral provisions all depending on and flowing from the principal purpose, but, unless the title distinctly suggests the purpose, it is deceptive and illegal.

It may be true that, in a very broad view of the power of the State to look after the health of its citizens, one of the considerations may bear on the practice of medicine. But this does not lead to the conclusion that a mention of health in the title expresses the purpose of all legislation that may have a bearing on the public health, direct or remote. If this were so, it would be sufficient to entitle an act as one to

provide for the public welfare or the public prosperity, in order to legislate on almost any subject. The regulation of mills and mill-dams, the inspection of salt or of provisions, the draining of marshes, the adulteration of liquors or medicines, the regulation of labor hours, the removal of nuisances, the supply of water, and a multitude of other things, are seldom touched by legislation except on the ground of guarding the public health; but no court with any regard for common sense could allow such a title as that given to the present act to cover one of those subjects. And if it could cover one, it could cover all at once, for the subject of medical practice is no more germane to public health than any of the other subjects. If this title covers that, it is impossible to say what it does not cover. It would be easy, and if this practice is permissible it might save considerable trouble, to include within it every one of the multitude of civil and criminal provisions which now have recognition, or may hereafter be recognized by legislators, as having a bearing on public health. The only purpose clearly defined is that of giving medical colleges, as well foreign as domestic, and beyond as well as within our jurisdiction, a monopoly of furnishing medical practitioners, and shutting out all others; and no such purpose appears in the title, which has no reference to practitioners at all.

Under our old Constitution it was possible and not uncommon to include within a title, whether clear or vague, matters in no way pointed out by it, and yet even under that no such thing was ever done in regard to health legislation as has been attempted here. There is no doubt that under the old system members of the Legislature were often deceived into waiving an examination into the details of an act which they supposed from the title related to something which they took no great interest in. But there is similar danger in regard to the members of the community generally, who may omit to act in matters closely concerning them from igno-

rance of legal provisions which the title does not suggest. Few men, whether laymen or lawyers, in running over the contents of a new volume of Session Laws, would think of searching in a statute apparently not of personal importance to them for provisions of vital importance. And in the present case, even the maker of the index to the Session Laws of 1883 omitted, under the head of "Physicians," to make any reference to the qualifications required by this act. There is nothing in the index to the journals of either House or Senate to indicate that any law regulating medical practice was ever passed. The indexes only show that a law with a proper title was introduced and did not pass. But the journals may be searched from beginning to end without any indication that medical practice was regulated at all. If such legislation can be had without more light given to the public than this title gives, the constitutional prohibition is of no use.

We had during the territorial days, as well as under the former Constitution, several laws concerning the practice of medicine, but we had none which did not treat of it as a separate subject. Our so-called "health legislation" has seldom gone under any such appellation beyond fixing the powers and duties of health boards in looking after sanitation, and providing for safeguards against contagious or epidemic diseases. I have discovered nothing even in this direction without a title which gave some information concerning the purpose of the law, beyond its reference to public health. Nothing but a lively imagination would assume that an act to promote public health could be confined to, or even cover the regulation of, medical practice, or that any such object could be regarded as " *expressed* " by it.

This would, in my judgment, be enough to destroy the validity of the statute, and I do not regard the objection as a formal one. It is perfectly well known that the registration required by the law was largely neglected by those who

had rights to registry, and that a knowledge of its terms was anything but general in the community.

But I think the objections to the character of the law itself are quite as plain, and in principle much more serious. This is the first instance in our State history wherein the citizens of the State have been prevented from employing such medical aids and advisers as they have seen fit. We had, in 1838 and subsequently, laws which created medical societies, and gave to the physicians examined and licensed by them privileges beyond others, but the only disability imposed on others was that of suing for their fees, a disability which in England applied to the higher and not to the lower ranks of both legal and medical practitioners, and was never regarded as a very serious drawback. And the Revised Statutes of 1838, p. 174, § 8, furnish a striking commentary on the danger of absolute exclusiveness, by recognizing that in three of the oldest places in the State, Mackinaw, Sault Ste. Marie, and Fort Gratiot, there might be no physicians licensed by the medical societies, and allowing the military surgeons there to collect their fees without license only in case of the absence of persons licensed. While the two former places have been proverbially healthy, it is not likely that an experience of three-quarters of a century or thereabouts had left the people without physicians and surgeons of some kind, regular or irregular. In March, 1843, this disability was removed, leaving unlicensed practitioners to stand on the same footing with regulars as to malpractice. Laws of 1843, pp. 41, 42. In March, 1844, the medical societies were deprived of all authority, and put on the footing of purely voluntary associations. Laws of 1844, p. 73. The Revision of 1846 re-enacted a considerable portion of the old medical society law, but did not put persons not licensed by them under any disabilities beyond punishing them for falsely pretending to be licensed. They were, as before, put on the same footing as to malpractice. Rev. Stat. chap. 36. Certain exclusive privi-

leges of the State medical society, for purposes of dissection, were by section 33 to end when the medical department of the University should be organized, which was done in 1849. At the first session of the Legislature, in 1851, under the new Constitution, chapter 36 of the Revised Statutes of 1846 was repealed, and from that time on medical practice has been left without restraint.

There was nothing in any of the statutes which necessarily confined the medical societies to any one system of medicine, but in fact, as matter of public history, they were exclusive; and by the power of refusing licenses, and of removal of members, they shut out all who had new or peculiar views. This is known to be the reason of the various legal changes removing by degrees the old exclusive privileges; and the final legislation of 1851 was beyond question based on the recognition that it was the only way to secure equal rights. A subsequent series of statutes, intended to compel recognition in the University of the claims of the homeopathic school, was resisted and renewed until the opposition was broken down. For about half a century there has been no time when any person could not choose his physician from any class which he might prefer, and the right to practice has been as well recognized as the right to carry on any other pursuit. And there never was a time in State or Territory when any person of lawful age could not insist on an examination for a license, or when the exclusion of persons, otherwise competent, for any peculiar opinions upon medical topics would not have been an abuse of power. It is equally matter of universal knowledge that no intelligent physician now would follow implicitly the practice of 50 years ago, and that the changes in the practice of all schools are largely, if not chiefly, due to ideas which were deemed heretical, and kept down just as long as it was possible to suppress them.

If it were competent, as I do not believe it is competent, for a Michigan Legislature to adopt a medical theory, and

force it on all its citizens, and adopt efficient means to choke down all others, this law has done no such thing. Neither does it enable the citizens of the State, or any others, to obtain the means of preparation for practice. But, aside from its defects in this particular, it is in the outset still more vicious in depriving citizens of existing rights in gaining their livelihood, as well as in getting medical help which they are willing to rely on. Our laws have always allowed practitioners to follow their own systems, and where they have given preferences it has been in such a way that all persons could obtain the same rights upon an examination before similar bodies, without distinction of previous education in or out of colleges of medicine. If the skill and knowledge existed it was not material where they came from, and experience in a medical college only counted as so much time in apprenticeship. Had such an examination been made indispensable, which it was not, it would have been free entirely from legal inequalities, and open to all alike. The medical society system was less open to fault for denying persons equal rights before the law than any other. The faults which led to its abolition were its practical preferences, and not the legal necessity for making them.

It would be difficult to devise a plan more open to the fault of legal inequality than the present one, which, while it imposes rigid terms, furnishes no means of satisfying them.

The arbitrary rule that a non-graduate practitioner must have practiced in this State five years previous to 1883, while it makes no allowances for practice elsewhere, and none for future practice here, lays down no rule of fitness at all, and no rule to which any one can conform. One day's difference in the arrival of two physicians in the State makes a fatal difference in their civil capacity, and in the case of the last arrival makes him forfeit, by an *ex post facto* law, all the rights he owned and exercised for 4 years and 364 days, although he may be a man of long experience and established.

reputation. His only chance to live in this State is to begin life over again as a student of some one who has been here a day longer, or of a graduate who may never have had a patient, and practice under the supervision of such a master, or enter some college and pursue studies where he may be competent to teach his teachers. And in the mean time his practice is destroyed, and himself and his family deprived of all professional means of livelihood. No power to work such ruin can exist in a legislature by any implication. It is not the exercise of legislative power in any proper sense of the term, but plain and arbitrary tyranny.

The case is no better for the future. There is just as little equality before the law. If the State had established medical colleges, all working on equal terms, and under the same conditions, and required all persons to be licensed by one of them, there would be something like equality as far as they go. But this law does not so provide. We have in Michigan only one medical college known as such to the Legislature. That is the Michigan University, which has one department, or school of a department, not required by law to follow any particular system, and another school teaching the homeopathic system. Practically all are shut out who do not accept one of the two systems actually in vogue there, or such modifications as they may hereafter see fit to adopt. These two schools are under public management by State officers. The only other medical schools now or hereafter possible must organize under laws which impose no conditions as to the kind or quality of teaching or the tests of scholarship. The laws give no assurance that they will have competent teachers or competent graduates. But their graduates have in law an absolute right to practice and to take green students and set them at practice as soon as they receive their diplomas. The law requires no knowledge of anatomy, no clinical experience, and no amount of any kind of knowledge, and no uniform examination, or examination at all.

70 MICH. 3.

In regard to physicians not educated in this State, it requires actual graduation from a medical college, which may be in any region of the world, and may be corporate or otherwise, if only legally established. Here again is an inequality in the rights of citizens of other states as well as of other people of our own State or elsewhere. No provision is made for those persons who have been passed on examination by the only tribunals provided for by the laws of most states and countries. The medical colleges of the United States are confined to a few states, and in some states are confined to particular schools of medicine. Some cannot give their graduates power to practice even at home, until they have been examined by the public censors. Some are notoriously imperfect, and some are fraudulent. There can be no possible equality under such a system. But it is perhaps for the present purpose more important to know who are excluded.

All are excluded, however competent, who have not graduated from a medical college. It is safe to say that this would exclude a large share of the best-educated and eminent medical men of foreign countries. The college of physicians which from the time of Henry VIII. had the exclusive power to examine and license practitioners in and within seven miles of London, and which had similar power elsewhere in England, except over graduates of Oxford and Cambridge, was not a college in the sense used by our statute, teaching and graduating students in medicine, but simply a corporation of learned physicians, who had an examining board of censors, and who were bound to examine every one who presented himself. Some controversies have arisen concerning the extent of their discretion as well as their jurisdiction, *Bonham's Case,* 8 Coke, 365, being one somewhat noted. In Lord Mansfield's time this college assumed to have an amount of discretion which, he plainly intimated, was usurped, and in deference to some strong suggestions their obnoxious by-laws were amended. But it appears from some reported cases that

their functions were very different from those of ordinary schools of medicine. See *Rex v. Askew*, 4 Burrows, 2186, 2203; also *Rex v. College*, 5 Id. 2740, which contains a full account of the controversy between the college and its licentiates as to their mutual rights. It is questionable whether the systems of medical education in Europe generally bear any very close resemblance to our American system, which graduates physicians from the schools directly. And it is very certain that some schools, which may have good qualities as far as they go, do not graduate physicians at all competent to practice without further training.

This statute puts all these places, without reference to character or merits, on the same level. They owe no allegiance to Michigan, and are in no relations with it, and yet this law gives them a very powerful control over our citizens. At the same time it prevents people who live here, and know nothing of our ways and language, from being ministered to in their necessity by their own countrymen, however capable and skilled, who do not happen to be graduates of medical colleges.

In my judgment this law is one of the worst violations of constitutional freedom and private security that has ever been obtained from careless legislation. It contains no safeguards or assurances of competency, and establishes no uniform rules, and no rules at all, for the examination within the State, and by State authority, of those who can get a diploma anywhere; and it at the same time cuts off all those persons who may have passed thorough examinations before legal boards, and have pr.  ed their competency in every way except by living here the precise period of five years before 1883. It makes illegal and punishable by *ex post facto* legislation what was before legal, and is now legal except for the cause of residence, and does not allow past and future residence even to be effectual. And it deprives citizens and

families of medical aid except on terms not regulated by our own laws, but by foreign laws or usages.

The law is also defective in providing for no future registration. But while that defect is obvious it is less important in principle than the rest. The registration seems to have been devised chiefly for statistical purposes, which have no particular tendency to promote the public health.

I think the conviction should be reversed, and the prisoner discharged.

Morse, J., (*dissenting*). I agree entirely with all that Mr. Justice Campbell has said in this case, but I cannot be content without calling special attention to one feature of this most unjust law, which feature embraces the main object of the act, to wit, to bestow special privileges upon college graduates, and to deny to others of equal learning the right to earn a livelihood in this State in their chosen profession. If, as a majority of this Court seem to hold, the power of the Legislature in this respect is absolute, and the courts are powerless to prevent this subversion of constitutional rights to build up an aristocracy in a free government, and there is no relief or remedy save in the wisdom and patriotism of the people at the polls, then it would seem proper that the true nature, purpose, and effect of this law "to promote public health" should be set before them from some source, as the title fails to inform them of its true purport and meaning.

If the title of this act had read,—

"An act entitled an act to create and perpetuate to college graduates a monopoly in the practice of medicine and surgery in this State,"—

It could never have become a law, if I mistake not the sentiment of our people. Yet such a title would correctly designate the object of the act.

It requires but a casual examination of the law to find that

no man, who had not been a resident of this State for five years before the act took effect, and actually practiced medicine therein continuously for that period, can hereafter practice medicine or surgery unless he is a graduate of a "legally authorized medical college," save as the servant or hired man of some graduate or five-years man. A student or undergraduate can practice "with and under the instruction" of the favored class, but there is no provision whereby he can ever escape from this slavery in his profession unless he has the means and time to be stamped by some medical college as a free man. Section 2, subdivision 2, Laws of 1883, p. 178.

It makes no difference what his knowledge, skill, or ability may be, or the length of time he has been gaining an honorable living in his profession in other states, or how successful he may have been in his combat with disease and death, he must nevertheless attend college, and graduate somewhere in Africa, Asia, Europe, or America,—it matters not in which country,—or he must look for his home and work outside of Michigan.

He may have entered the army as a hospital steward, and, by his aptitude and skill in medicine and surgery there acquired, won, by experience and attention in his duties, promotion to assistant surgeon, and from that to full surgeon, of which promotion there have been instances; aye, he may have gone into the service from active practice as a physician, at home, as assistant surgeon or surgeon of a regiment, and had the benefit of the experience of four years in the many diseases, wounds, and accidents incident and common to warfare, and yet, unless he was a college graduate, or had lived in this State for five years, and practiced all that time, when this law went into operation, he must quit his profession in this State, without regard to his age, service, or ability, and attend a theoretical school of medicine, and there graduate, or practice, perhaps, under the instruction of some beardless youth, fresh from a medical college, with his diploma in his

pocket, and whose whole experience in surgery may have been confined to a cut finger or some other light flesh wound.

On the other hand, a mere quack or ignoramus, without learning or experience, with a bogus certificate, or a *bona fide* graduate, but one incapable of appreciating the true theory of medicine, and entirely unable to put such theory as he has into successful practice, and who can learn but little, if anything, from experience (and such persons are not wanting), and without any actual experience in medicine or surgery, can go before the county clerk, and, by making the required affidavit, at once enter upon the business of making and dispensing pills and operating with the surgeon's knife. He may not know his liver from his stomach if he but have his college paper title, and it is but little matter whether such title is genuine or counterfeit.

There is no provision, save by a criminal prosecution, to determine whether the diploma he holds was delivered to him by a legal college in a regular manner, or by a bogus institution, like that of Dr. Buchanan. There is no way pointed out to ascertain whether he holds his certificate by fraud or by right. A quack, with a counterfeit or stolen certificate, can register and practice until some of his dupes, or a rival physician, are moved to prosecute him. There is provided in the act no means of identification; no witnesses are required. A traveling quack, under an assumed name, locates temporarily in town, files his affidavit, and goes on with his business, and there is no method provided to unmask him save by a criminal prosecution. The law does not prevent imposture or quackery; it encourages it.

And in the event of a criminal prosecution of one pretending to hold a certificate from a medical school in a foreign country, I apprehend there would be some difficulty in establishing the fact that it was not genuine, or that it was not issued by a legally authorized school. Yet the act makes no

distinction between certificates granted in this country or in India or China.

In all the states of this Union having similar laws, I find but one, Nevada, confining as this act does, the practice of medicine to college graduates. In most of the states there are also state boards of health, or public examiners or censors, before whom a candidate for practice can go and prove his right and merit by an examination. In such case, if such board acts arbitrarily and without reason, and rejects applicants from mere spite or caprice, or because they do not belong to the same school of medicine as the censors, or did not graduate at a particular school, the courts can interfere and compel such board to do justice. *Board v. Cooper*, 123 Ill. 227 (13 N. E. Rep. 201).

But here the courts are powerless. The parchment controls; and there is no authority anywhere to determine its validity, or to prevent unworthy or knavish men from committing frauds in practicing under counterfeit certificates, except, as before said, at the end of a criminal trial.

Most of the states also except from the operation of the law army and navy surgeons in the war for the Union.

It is claimed that the courts have no power to prevent the Legislature from doing anything simply because it is absurd or unjust, and that, unless this law comes within some express prohibition of the Constitution, it can be reached and remedied only by the sovereign power of the people through another Legislature; that under the police power of the State the authority of the Legislature is limitless, save where it comes in direct conflict with the written charter.

It has been said in one state that police regulation can be made as affecting classes; that the Legislature may pass laws prohibiting any one over 60 years of age from practicing medicine or law, or forbidding any but a female physician from visiting a female patient; and it is intimated that, if the Legislature should see fit to pass a law prohibiting men from

practicing medicine if they had red hair, the only remedy would be in the good sense and justice of the people.

I do not deny the right of the Legislature to provide a competent board who shall examine and pass upon the qualifications of all applicants who desire to enter upon the practice of medicine, and to prescribe that only those who shall pass a competent examination shall be entitled to practice in this State; but I deny the right of the Legislature to enact that none but college graduates shall practice law or medicine.

There can be no office, place of profit, honor or preferment, or business or profession open to a college graduate in this country from which a man of equal learning, morality, skill, and experience can be debarred by law without serious hurt and damage to the public weal, and without violation not only of the spirit but the letter of our Constitution. Such a law is in open hostility and in defiance of the essential principles of freedom upon which our government is founded.

There can be no distinction made even in police legislation that is unreasonable and unjust, and serving no useful purpose, to build up a favored class at the expense of the great mass of the people, in conflict with the fundamental law, and against every element of natural justice.

Neither can there be any special privileges granted or equal rights denied without reason or justice, and to subserve no necessary end in the administration of a free government, or in the promotion of the public welfare.

When the vital spirit of the Constitution is violated, and class distinctions made by law to elevate one class of men and depress another, when one class is permitted to engage in any business or practice any profession without regard to their experience or fitness, and another class deprived of the same privilege upon the same principle, for no good reason, it is the duty of the courts, it seems to me, to stand in the way of such legislation, relying upon the spirit of the Constitution. In such cases it is not necessary to hunt for express

words, because such laws are repugnant to every principle of a republican government.

I hope it will not be contended for a moment by any one that the Legislature could, under its police or any other power, prescribe that a man must be of noble birth, or of a certain blood or nationality, or possess a certain amount of wealth, in order to practice law or medicine in this State, and yet there is no express prohibition in our State Constitution against such legislation. There can be created by law in this country no aristocracy of birth, color, or wealth in the pursuit of business, or in the practice of the professions, nor can there be granted to such an aristocracy a monopoly of any business or profession. It would be a clear violation of the spirit of our Constitution, and could not be tolerated or permitted by the courts.

Nor can the Legislature, in my opinion, create an aristocracy of college graduates without reference to their learning, skill, or experience in any of the professions, and grant to them a monopoly in the practice of medicine or law.

The time has always been in this State, prior to the passage of this act, when a young man, ambitious to acquire learning and skill in either of these professions, and too poor to attend college, could go into the office of a skilled and experienced practitioner, and with the precept and example of his master every day before him, by diligent study and attention, the reading of text-books, and the compounding of medicines, or the trial of justice's suits, under the eye and instruction of one skilled and learned in the profession and practice, after a few years start for himself, untrammeled in the race, as his own master, and no man's servant in his profession. And some of the best men in both of these professions, at least in times past, if not in the present, have thus graduated without a college diploma. From this time on in medicine, unless this law be repealed, this avenue to profit and honor is cut off and closed up. And if it can be done in medicine it

can be done in law.   The Legislature may yet deny, unchallenged by the courts, the right to practice law in this State without a diploma from a law school, or even prescribe that none but graduates of the State University shall so practice, and there will be no relief save in an appeal to the people. I am glad my mind is not yet prepared to hold that such unreasonable, arbitrary, and unjust qualifications can be prescribed by the Legislature under any power in a free government because there is no express language in the written Constitution forbidding it.    Here all are placed upon—

"An equality in the great natural rights of personal security and personal liberty."

In this country—

"All avocations, all honors, all positions, are alike open to everyone, and in the protection of these rights all are equal before the law."   *Cummings v. Missouri,* 4 Wall. 277, 320.

Section 1, Art. 14, of the amendments to the United States Constitution, provides among other things that—

"No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, *or property* without due process of law, nor deny to any person within its jurisdiction the *equal protection of the laws.*"

Our own State Constitution also ordains that no man shall—

"Be deprived of life, liberty, or property without due process of law."   Art. 6, § 32.

Here seems to me to be an express prohibition against any such laws as this under consideration, for—

"Included under property are those estates in which one may acquire in professions,   *   *   *   often the sources of the highest emoluments and honors."

The Legislature cannot discriminate between its own cit-

izens and the citizens of another state in business avocations, nor grant to one class of its people the exclusive right to sell bread or market potatoes, but it can, it is claimed, confer upon college graduates the exclusive right to practice the learned professions.

I cannot assent to the proposition for the reasons above stated.

If it were an established fact that the public welfare demanded that only college graduates should practice medicine, then the shutting out of all others might be reasonable and just, and perhaps sustainable under the police power of the State, upon the principle that the preservation of the State and its people is paramount, as self-preservation is the first law of nature. But the public welfare does not demand it. Learning, skill, honesty, and experience, the public need in the medical profession, rather than parchment certificates of qualifications from colleges; and it makes no difference where these qualities are obtained, and the attainment of them should be open to all, and when acquired, whether by apprenticeship at home, or away from home at school, the path of the profession should not be barred against the apprentice, and open to the school graduate, when both are equally equipped for the race.

The respondent ought to be discharged.